UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | : | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 18 Cr. 109 (DRC) |
| - v. - | : | |
| ANDREY SHUKLIN, | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM

The defendant was the leader of a criminal enterprise that used a series of moving companies to exploit thousands of people across the county by demanding ransom for the personal possessions and cherished belongings those people had entrusted the enterprise to transport. For the reasons outlined, a Guidelines sentence of 97 to 121 months' imprisonment is appropriate.

## BACKGROUND

I. **The Offense Conduct**

A. <u>Background on Moving Regulations</u>

The U.S. Department of Transportation ("USDOT"), Federal Motor Carrier Safety Administration ("FMCSA"), monitors and enforces regulations governing safety and commerce for interstate motor carriers. A portion of the regulations governs the transportation of household goods by licensed motor carriers (*i.e.*, moving companies). *See* 49 C.F.R. Part 375. All household goods motor carriers engaged in interstate transportation of household goods must follow the regulations. 49 C.F.R. 375.101. Failure to comply with these regulations could result in the USDOT ordering the company to cease operating as a mover of household goods.

Interstate movers must also register with the USDOT. In order for a moving company to be registered with the USDOT, the moving company must apply to operate as a motor property

carrier and receive a USDOT number.  The USDOT number is a unique identifier used to monitor a company's safety information acquired during audits, compliance reviews, crash investigations, and inspections.  A moving company may not lawfully transport household goods without an approved USDOT number.  During the relevant period, the application to operate as mover of household good was known as an OP-1 form, or later, Form MCSA-1, and was available through FMCSA.  On the OP-1 and MCSA-1 forms, all applicants must disclose, under penalty of perjury, any relationship with any other FMCSA-regulated entity within the past three years, including any ownership interests or management positions.

Under those regulations, carriers must provide all moving estimates for household goods to potential customers in writing and must indicate clearly whether the estimate is binding or non-binding. 49 C.F.R. 375.401.  With a binding estimate, the customer and the moving company must both agree in writing to a fixed charge for all services prior to the start of any work.  49 C.F.R. 375.403.  The moving company may re-negotiate the contract with the customer if the moving company believes after an on-site inspection that the weight of the actual shipment significantly exceeds the original estimate, but this re-negotiation must be done before any work is commenced and with the customer's full consent and knowledge.  49 C.F.R. 375.403.  The moving company is expressly barred under the regulations from amending the estimate after loading the shipment. 49 C.F.R. 375.401.  Failure to deliver a customer's shipment upon the customer's offer to pay the binding estimate amount (plus additional charges not relevant here) constitutes a failure to transport a shipment with "reasonable dispatch" under the regulations and subjects the moving company to "cargo delay claims." 49 C.F.R. 375.403.

Pursuant to federal regulations, movers must deliver household goods "in a timely manner." 49 C.F.R. 375.601.  Unless the requirement is waived, movers "must tender a shipment for delivery for an individual shipper on the agreed delivery date or within the period specified on

the bill of lading." 49 C.F.R. 375.603.

Moving companies must follow the regulations and allow for regular inspections by federal regulators. Failure to meet the requirements set by USDOT can result in a moving company being placed out of service. A company placed out of service is no longer authorized under federal law to operate as a mover of household goods.

B. The Enterprise

The charged criminal enterprise, led by the defendant, flouted these regulations. In doing so, over the course of five years, the criminal enterprise presented itself as at least 12 different moving companies,[1] and profited from the exploitation and manipulation of thousands of victims. (*See* Presentence Report ("PSR") ¶¶ 31-41, 52). Those victims hired the enterprise to move them, based on false representations and assurances by the enterprise members, as well as federal certifications obtained through fraud. (*See id.* ¶ 52). The enterprise lured victims into binding contracts, containing square footage estimates that were purposefully low. (*See id.* ¶¶ 48-49). The enterprise then extorted the victims into paying more than contracted for based both on falsely inflated square footage numbers, but also by capturing the victims' goods on moving trucks before increasing the price for the moves. (*Id*. ¶ 48-49). The enterprise then either delivered the goods late, or never delivered them at all. (*See id.* ¶ 44).

Whenever the aftermath of their crimes became too complicated and messy, the enterprise simply shed its skin and reincorporated as a new entity, with lies on their websites and documents

---

[1] The companies, with their authorized operation dates, are: JBR Underground doing business as United National Moving and Storage (2008 – 2015); National Relocation Solutions (2014 – 2015); Independent Van Lines (2014 – 2015); National Relocation Van Lines (2014 – 2015); US Relocation Systems (2015 – 2016); First National Moving and Storage (2016); Public Moving and Storage (2016 – 2017); Public Moving Services (2017); Smart Relocation Solutions a/k/a Presidential Moving Services (2017 – 2018); Unified Van Lines (2017 – 2018); and Flagship Van Lines (2018). (PSR ¶¶ 31-41).

3

about their experience, and lies on their federal forms about ownership and accountability. (*See id*. ¶¶ 30, 47; Indictment at 7-9). They shielded their members by assigning them new names, and abandoning the phones and contact information of their tainted prior form. (*See* Indictment at 8; alias list examples attached as Exhibit 1 (listing "aliases," new phone numbers, and new emails for employees)).

The completeness of their frauds, the thoroughness of their lies, enriched the enterprise handsomely. The conservative loss amount in this case is over $2.4 million. (PSR ¶ 52).

C. The Defendant's Role

The defendant was one of two leaders of the corrupt moving enterprise. He was in charge from the beginning of the conspiracy to its takedown in this case. He, more than anyone else, enjoyed the financial spoils of the complex fraud, spending money straight out of the corporate bank account on himself.

He was not a hapless émigré, presented as the front of the company against his will. He was one of the bosses running the enterprise. He was one of the select few within the company who received hundreds of emails showing the real cubes (*i.e.*, the actual space a customer's goods used during a move) versus the fraudulent, inflated cubes charged to customers. (*See* examples of emails attached as Exhibit 2). He signed the lease for the Florida headquarters of the moving enterprise as the Manager. (*See* lease attached as Exhibit 3). He provided approval of the text that appeared on the websites and the press releases. He even contributed some of the false statements. For example, in 2017, the defendant sent an email of his edits to a press release for Presidential Moving Services, which included adding the false statements that "[t]he company has been operating on the market for 20 years" and "[f]or all these years the company has adhered to the principles of 'everything for the customer' and has a huge number of happy customers!" and asserting they had professional crews with "at least 5 years experience[.]" (*See* examples from

4

websites attached as Exhibit 4 at 4).

He also repeatedly lied to federal agents and regulators from the Department of Transportation about the moving enterprise and his role. This included his efforts "reincarnating" into "new companies" through fraud during the time he was the owner, with its main office where the defendant worked in Hollywood, Florida. (Plea Agreement at 7-8). When one entity was placed out of service by USDOT, the defendant and the enterprise simply started a new company under the name of a fake owner and registering the new company in a different state, with listed business locations in Ohio, Maryland, North Carolina, Illinois, Texas, California, Connecticut, Colorado, and Missouri. (PSR ¶ 47).

The defendant, along with Serghei Verlan, made new profiles on their moving software program with specific jobs prior to compliance reviews by regulators. The new profiles displayed a limited number of moving jobs to hide the complete list from the regulators. Then, on June 1, 2017, during execution of a search warrant of the Florida headquarters of the moving enterprise, the defendant claimed, among other lies, that Public Moving Services was owned by Alexis Pistun, and Public Moving and Storage was owned by Evgenia Zershcikova (both of whom had fake IDs generated for them by members of the enterprise, and transmitted by the defendant). (Interview attached as Exhibit 5; *see* examples of fake IDs attached as Exhibit 6).

Damning in its own right, the fraudulent moves and reincarnations of the moving enterprise continued after the interview and search warrant. The defendant made no effort to stop it and no effort to walk away. Instead, he continued running the corrupt enterprise and spending the proceeds.

The defendant and his partner Serghei Verlan directed the multi-state, multi-year fraud and benefitted handsomely while thousands of victims suffered irreparable harm. The defendant and Verlan are the most culpable members of this criminal organization.

5

**II.     The Defendant's Plea and Guidelines Range**

The defendant pleaded guilty before this Court on January 25, 2021.

Probation has calculated the defendant's Guideline range as follows (*see id.* ¶¶ 58-73):

Count One: 18 U.S.C. § 1962(d) – RICO Conspiracy

- The United States Sentencing Commission Guidelines Manual ("U.S.S.G."), effective Nov. 1, 2018, applies to this conduct.

- Pursuant to U.S.S.G. § 2E1.1, the base offense level is either 19, or the offense level applicable to the underlying racketeering activity, whichever is higher. Pursuant to U.S.S.G. § 2E1.1, Application Note 1, such determination is made by applying Chapter 3 Parts A, B, C, and D.

- The underlying racketeering activity applicable to the defendant is wire fraud, which is governed by U.S.S.G. § 2B1.1. Pursuant to § 2B1.1(a)(1), the base offense level is 7, because wire fraud has a statutory maximum penalty of 20 years' imprisonment.

- Pursuant to U.S.S.G. § 2B1.1(b)(1), because the loss exceeded $1,500,000, and was less than $3,500,000, 16 levels are added.

- Pursuant to U.S.S.G. § 2B1.1(b)(2), because the offense involved 10 or more victims, 2 levels are added.

- Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the scheme involved sophisticated means, two levels are added.

- Pursuant to U.S.S.G. § 2B1.1(b)(11)(B)(ii), because the offense involved the production or trafficking of any authentication feature, two levels are added.

- Pursuant to U.S.S.G. § 3B1.1(a), because the defendant was a leader or organizer of a criminal activity that involved five or more participants, or was otherwise extensive, four levels are added.

- The USAO does not oppose a two-level reduction in offense level pursuant to U.S.S.G. § 3E1.1 based upon the defendant's acceptance of responsibility, provided that the defendant's conduct continues to demonstrate compliance with the terms of § 3E1.1. The defendant may be entitled to an additional one-level decrease pursuant to § 3E1.1(b) in recognition of the defendant's timely notification of his intention to plead guilty.

In accordance with the above, Probation calculated the total offense level at 30. PSR ¶ 73.

Probation calculated the defendant's criminal history as I. *Id.* ¶ 78. The defendant's Guideline

Case: 1:18-cr-00109-DRC Doc #: 231 Filed: 05/04/22 Page: 7 of 20 PAGEID #: 1440

range then is 97 to 121 months' imprisonment. (*Id.* ¶ 92). The Government agrees with Probation's Guidelines calculation.

## DISCUSSION

### III. The Contested Enhancements Apply to the Defendant

The defendant has challenged numerous facts in the PSR, as well as the application of three Guideline enhancements that the Government and Probation believe apply to the defendant's conduct.

At bottom, the defendant misapprehends his responsibility as a conspirator in a corrupt enterprise. The Guidelines direct that a defendant who participated in "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as conspiracy" is responsible for "all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity[.]" U.S.S.G. § 1B1.3(a)(1)(B). The commentary explains that "[i]n order to determine the defendant's accountability for the conduct of others under [the subsection], the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement). In doing so, the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." U.S.S.G. § 1B1.3 comment. (n.(3)(B)). This means that a defendant may be "potentially liable for the foreseeable criminal acts of others in furtherance of the criminal enterprise even though he did not personally participate in them." *United States* v. *Tocco*, 200 F.3d 401, 430 (6th Cir. 2000) (quoting *United States* v. *Carrozza*, 4 F.3d 70, 75 (1st Cir. 1993) (indicia of alteration omitted)).

7

The defendant's repeated assertions that he did not personally and directly participate in various facets of this complex fraud carry little practical weight at this sentencing stage. The question for this Court is not whether the defendant himself used Photoshop to make a fake license, or himself entered the false address on the moving company website, or micromanaged every decision made by every employee, but instead were the particular criminal acts of the moving enterprise within the scope of the defendant's agreement, in furtherance of the criminal activity, and reasonably foreseeable to the defendant. Evaluating each of the challenged enhancements in turn under this guidance establishes that all of the challenged enhancements apply to the defendant.[2]

### A. The Defendant's Scheme Involved Sophisticated Means

The defendant claims that "he did not relocate or participate in the relocation of the scheme to another jurisdiction to evade law enforcement or regulatory officials" and, regardless, argues that "this conduct does not constitute sophisticated means." (PSR Addendum at 27).

Starting with the second assertion, the defendant is wrong. Under the applicable guideline:

> If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase [the offense level] by 2 levels.

U.S.S.G. § 2B1.1(b)(10)(C). The Guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," listing as examples, "locating the main office of the scheme in one jurisdiction but

---

[2] In addition to the evidence presented here, the Government is prepared to offer witness testimony at the sentencing hearing in support of the enhancements.

locating soliciting operations in another jurisdiction" and "use of fictitious entities, corporate shells." U.S.S.G. § 2B1.1, comment. (n.9).

As to the defendant's first protestation, he did in fact relocate or participate in relocating the corrupt moving enterprise to avoid Department of Transportation scrutiny and furthered the enterprise through sophisticated means. As he admitted in his plea, the moving enterprise "reincarnated into numerous 'new companies' through fraud during the time [the defendant] was an owner and worker" for the moving enterprise, and each of these reincarnated entities controlled by the enterprise listed addresses in other states throughout the country. (Plea Agreement Statement of Facts at 8; PSR ¶ 47 (listing 10 different states out of which the reincarnated companies purported to operate)). The enterprise furthered this aim by listing fake owners on USDOT documents and registering the new entities in different states, "concealing the true owners, operators, employees, and operations of the affiliated companies of the Moving Enterprise." (Plea Agreement Statement of Facts at 7). As the defendant further admitted, this fraudulent reincarnation involved "materially false statements to federal regulators," lies to customers and third parties, and fraudulent reincarnation occurring "during the time [the defendant] was an owner and worker for the Moving Enterprise." (*Id*. at 7–8.)

In fact, the reincarnation scheme was in place from the very beginning. The defendant and Serghei Verlan purchased the moving company JBR Underground in 2013, with the defendant listing himself as the owner on a form filed with DOT. (*See* ownership documents attached as Exhibit 7). The company began doing business under the name United National Moving & Storage. Beginning that same year, customers began filing complaints to the FMSCA about the company increasing costs for moves above the binding estimate after household goods were loaded on the moving truck.

9

FMCSA ordered JBR Underground to cease operating as a household goods carrier and placed the company out of service in September of 2015 for failing to pay a penalty assessed because the company failed to allow FMCSA personnel to conduct an inspection.

But by the time JBR Underground was ordered out of service, the moving enterprise had already reincarnated as a new entity. In April of 2014—less than six months after the defendant took over as the sole owner of JBR Underground—National Relocation Solutions submitted a trade name application to Maryland stating that JBR Underground was the full legal name of the corporation using the trade name National Relocation Solutions. (*See* Exhibit 7). That application was signed by the defendant as the "Managing Owner" of JBR Underground. In June of 2014, before JBR Underground was placed out of service, the defendant filed an OP-1 form with FMCSA for National Relocation Solutions, certifying under penalty of perjury that he did not have any relationship with any other FMCSA-regulated entity within the past three years (despite his previous filings as the owner of JBR Underground). (*See id.*).

Later in 2014, the defendant again submitted an OP-1 form, this time for Independent Van Lines, listing himself as the owner and again certifying he had no relationship with any other FMCSA-regulated entity within the past three years. (*See id.*). The defendant admitted later to federal agents that he set up Independent Van Lines in order to get a mortgage.

From there, the iterations of the moving enterprise continued to proliferate, with members of the enterprise creating new entities typically a few months before a previous entity was placed out of service. After initially appearing on the forms, the defendant and Verlan listed other individuals on the ownership documents sent to the regulators—as detailed below—the names becoming more obscure as the multi-year fraud continued.

Throughout the run of the enterprise, while the companies changed names and lied about ownership on regulatory forms, the defendant remained one of the few signatories on the various

10

bank accounts. The account names themselves stand as evidence of the reincarnation scheme; for example, the defendant and Verlan were the authorized signers of a JPMorgan Chase account named "Olympus A&S LLC DBA Public Moving and Storage/President A&S DBA Presidential Moving Services." (Examples of bank records attached as Exhibit 8). The defendant was the signatory on Wells Fargo accounts for Olympus A&S, Independent Van Lines, and National Relocation Solutions. (*Id.*). The defendant and his wife were the signatories on a Bank of America account called "Moving National Solutions LLC DBA Public Moving and Storage." (*Id.*). The defendant used the various business bank accounts for his own personal expenses throughout the course of the enterprise. (*See id.*). These accounts received payments from customers who hired the fraudulently reincarnated affiliated entities.

In September 2015, the defendant signed a lease in the Hollywood, Florida location of the government's premises search warrants in June 2017 and August 2018. (*See* Exhibit 3). The defendant signed the lease as "manager" of National Relocation Solutions; his co-leader Verlan also signed the lease as "guarantor." (*Id.*). Search warrants at these locations contained files for all of the affiliated entities—registered with the USDOT as operating in other states—along with records from customers who were fraudulently overcharged from all of these entities.

If these reincarnations were not intended to avoid Department of Transportation scrutiny, why the repeated misrepresentations on the forms submitted to the Department? Why the false certifications and the fake owner names? There is no plausible explanation other than an effort to avoid regulatory and law enforcement attention on the relationships between the entities shut down for abuses and the new entities created to continue the fraud. In any case, this multi-year fraud involving fictitious entities and misrepresentations to federal regulators, customers, and third parties utilized precisely the type of sophisticated means contemplated by the enhancement.

Probation was correct that the enhancement applies.

### B. The Defendant's Offense Involved the Production or Trafficking of an Authentication Feature

The defendant asserts that "he did not alter state issued driver's licenses." (PSR Addendum at 28). But, as previously explained, the defendant's personal involvement in the alteration of authentication features is not required for this enhancement to apply. Under the relevant Guideline, two levels are added to the offense level if the offense "involved . . . the production or trafficking of any . . . authentication feature[.]" U.S.S.G. § 2B1.1(b)(11)(B)(ii).

It is hard for the defendant to argue credibly that the use of the fake IDs were somehow beyond the scope of his agreement, not in furtherance of the moving enterprise's scheme, or not foreseeable to him. He was directly involved in transmitting the fake IDs. For example, on April 18, 2017, the defendant received a copy of a fake ID to his email. (*See* Exhibit 6). The ID was purportedly a Florida driver's license and credit card for "Alexey Pistun," the man the moving enterprise was claiming was the owner of the reincarnated companies, Public Moving Services. (*Id*.). The defendant forwarded the ID from to the other leader of the enterprise, Serghei Verlan. (*Id*.).

Another fake ID used in the conspiracy was a doctored Florida driver's license that displayed a photograph of the defendant's wife—Tatianna Rakhmaninova—presented to a company that provided moving job leads. (*Id*.; *see* PSR ¶ 94). Like the other fake driver's licenses created to hide the true ownership, documents received from the Florida Department of Motor Vehicles concluded that the driver's license with the photo of the defendant's wife but in the name of a fake owner of the company was fraudulent. (Exhibit 6). The defendant would be hard-pressed to pretend he did not know that his wife's picture appeared on a driver's license that had a different name, which was then submitted to an entity that provided leads for his company.

12

Probation was correct that the enhancement applies and the defendant's objection should be overruled.

### C. The Defendant was an Organizer or Leader of the Moving Enterprise

The defendant objects to the application of the organizer or leader enhancement with a series of excuses including that his "role changed over time" and that he "took responsibility in limited areas," but "did not have a leadership role in training, directing, or supervising employees who were traveling to customer homes to load customer goods." (Def. Letter to Probation at 1-2 (March 17, 2021)).

Even assuming this recitation of the facts is accurate, they are not dispositive. Under the Guidelines, a defendant who was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," receives an offense level increase of four levels. When considering whether a defendant was an organizer or leader, the Guidelines provide the following suggestions:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1 comment. (n.4). The defendant need not meet all the criteria nor be the "brains behind the operation" in order for the enhancement to apply. *United States* v. *Sexton*, 894 F.3d 787, 795-96 (6th Cir. 2018).

As previously explained, the defendant certified he was the owner of multiple entities of the moving enterprise, during which the enterprise fraudulently reincarnated into affiliated companies. (Plea Agreement Statement of Facts at 7-8). Even after he began hiding the true

13

ownership of the iterations, he remained one of the three signatories on the various business bank accounts – the others being the defendant's wife and Verlan. (*See* Exhibit 8). For the length of the criminal conspiracy, the defendant spent money on himself and his wife directly from the various business bank accounts. (*See id.*).

The defendant not only profited handsomely from the scheme, but he was involved in the day-to-day operations of the enterprise. He personally received numerous emails from moving enterprise employees attaching customer documents with the inflated cubic footage charged, and also detailing the real cubic footage. (*See, e.g.*, Exhibit 2). It was not an occasional occurrence – it happened throughout the course of the entire conspiracy.

Despite fraudulent ownership documents provided to the USDOT, the defendant also represented he actually owned the reincarnated companies. For example:

- U.S. Relocations Systems listed co-defendant Phyllis Quincoces as owner on USDOT filings (while certifying no prior affiliation with a USDOT registered moving company), while Shuklin was listed as the owner in Florida Secretary of State filings. (Exhibit 7 at 8, 10).

- First National Moving and Storage listed Evgenia Prus (the identity on a fake driver's license, as set forth above) on USDOT filings, while Shuklin was listed as the owner in Florida Secretary of State filings. (*Id.* at 11-12).

- Public Moving and Storage listed Evgenia Zershcikova (the identity on a fake driver's license, as set forth above) on USDOT filings, while Shuklin was listed as the owner in Florida Secretary of State filings. (*Id.* at 13-14).

- Public Moving Services listed Alexei Pistun Sr. (the identity on a fake driver's license, as set forth above) on USDOT filings, while Shuklin was listed as the organizer in North Carolina Secretary of State filings. (*Id.* at 15-16).

These are just examples of the documentary evidence that the defendant owned and controlled all of the affiliated entities. Indeed, evidence seized during the premises search warrants at the Hollywood, Florida business location in 2017 and 2018 included records for all of the reincarnated companies, with files for customers from each entity, showing the defendant remained in charge of all of the affiliated companies, throughout the five-year period of operation.

Probation's application of the four-level leadership enhancement was therefore proper.

**IV. The Defendant's Conduct Warrants a Guidelines Sentence**

The factors that the Court must consider when fashioning a sentence include the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the defendant's offense, the promotion of respect for the law, the need for just punishment for the offense, and the need for adequate deterrence. *See* 18 U.S.C. § 3553(a)(2). All such considerations support a Guidelines sentence of incarceration between 97 and 121 months for the defendant's crimes.

A. <u>The Defendant's Crimes Harmed Myriad Victims</u>

The nature and circumstances of this offense are serious. Over the course of five years, the defendant and his criminal enterprise defrauded and exploited thousands of victims.[3] The victims vary in age, status, employment, and numerous other metrics, but are united in one simple way – they all were trying to move safely and efficiently their most precious, personal possessions from one home to another. They were seeking new refuge, whether it was down the street or across the country, and they entrusted the members of the criminal enterprise to help them reach it.

The victims were not naïve in hiring the enterprise; it was the enterprise that ruthlessly manipulated the means through which even the most diligent customer would seek to investigate

---

[3] The victim impact statements that have been received by the Government have been provided to Probation.

15

them before hiring. If victims went to the affiliate companies' websites, they would see false declarations, like the newly-formed company was celebrating its 20th anniversary. (*See* Exhibit 4). If the victims went to review websites, they would read glowing missives penned by the criminals themselves, describing how "great" and "professional" the company was. Even if the victims went to the U.S. Department of Transportation, they would find USDOT numbers for the affiliated companies, acquired through misrepresentations and lies.

After doing their research, the victims were then drawn in by promises of low rates and prompt deliveries. They booked binding estimates, which were supposed to be just that. They relied on the members of the enterprise, not knowing the people they were speaking to in the sales office were using fake names, and the numbers they were calling would one day just stop working, the repeated rings ignored by the same people who were offering false assurances. (*See* Exhibit 1).

After signing the contracts, the victims then made plans, dependent on their belief that the criminal enterprise would do what it claimed it would do. The victims purchased homes, signed leases, made arrangements with employers, babysitters, family members. They prepared themselves for the stresses and challenges that come from even the most efficient and fair moves.

On the day of the victims' appointed moves, members of the criminal enterprise came into their homes, boxed up their most personal and cherished possessions, and loaded them up on trucks. Then they changed the deal. They claimed the loads were bigger than they were. They claimed the square footage was off. They demanded payment upfront, and signatures on documents falsely asserting that any change had been agreed to prior to loading. They threatened to unload, or not deliver, the victims' possessions.

What were the victims to do then? They stared into loaded trucks containing their "household goods," terms of art that contain much more than those words suggest. Household

goods in this case means diplomas, baby books, irreplaceable family heirlooms, even relatives' ashes. In those moments when the victims were at their most vulnerable, they agreed to whatever they needed to in a sometimes vain attempt to keep hold of those items that enriched and documented their lives.

Some of those victims received their goods, after paying more than they should have. Some of those victims never did, left to seek reimbursement for items that can never be replaced, whose value can never be calculated in simple dollars.

After all this, those victims then had to rebuild their lives in their new home, knowing they had been defrauded in their most vulnerable moment, held hostage by an enterprise that viewed such violations as a business model.

These tragedies played out again and again and again. By the case agent's calculation, approximately 90% of moves conducted by the enterprise and subject to the agent's analysis were fraudulent. (*See* PSR ¶ 52). With deception this pervasive, the members of the enterprise all knew what was going on. Together, they profited off of the exploitation of thousands of people. And they did it over multiple years.

The defendant was the head of this enterprise. He knew what was happening, and he directed it. He financially benefitted more than any other member of the enterprise, spending money on himself straight out of the corporate bank accounts. The enterprise operated under his leadership and for his benefit.

B. <u>The History and Characteristics of the Defendant Support a Guidelines Sentence</u>

The defendant is an educated man. The defendant—described by his wife as a "very intelligent person"—received a college and advanced degree in law in his native Russia. (PSR ¶¶ 116-17, 119). He began a PhD program in economics, which he did not finish because he came to the United States to seek asylum. (*Id.* ¶ 117). He is smart enough to understand and execute

17

the scheme he led.

He is also smart enough to succeed without taking advantage of thousands of people. He came to the United States to seek asylum, trying to get the safety and opportunity he could not in Russia. (*See id.* ¶¶ 83, 102, 117). But instead of applying his intelligence and education to legitimate work, he instead spent years abusing and extorting the citizens of his chosen country, profiting from them at their most vulnerable.

He has demonstrated through his multi-year leadership of the criminal organization—and, frankly, the nature of his objections to the PSR—that he does not feel remorse for what he did, he does not register the depth of suffering he caused, and he does not accept the level of responsibility he should. The defendant deserves a Guidelines sentence.

  C. <u>A Guidelines Sentence Deters Other Bad Actors in the Moving Industry</u>

The criminal enterprise defrauded customers in a way the FMCSA labels "common" within the moving industry.[4] A June 2020 study conducted by the Better Business Bureau reported that FMCSA received 4,780 complaints related to moving companies in 2019.[5] The Better Business Bureau reported "[a]t least 1,335 moving companies have earned an 'F' rating from BBB due to unresolved or unanswered complaints, unusually large amounts of complaints, and other factors." In their estimation, "[t]he general public is at serious risk of encountering a dishonest moving

---

[4] FMCSA, "File a Moving Fraud Complaint," available at: https://www.fmcsa.dot.gov/protect-your-move/file-a-complaint ("There are many kinds of moving fraud. One of the most common is when a 'rogue' mover provides a low cost quote to perform an interstate move, loads your goods onto their truck, and then claims your load is over the weight estimate and the additional weight will be charged at an exorbitant price per pound. Consumers are forced to pay double or higher the original estimate just to get their belongings back.").

[5] BBB, "Know Your Mover," available at: https://www.bbb.org/globalassets/local-bbbs/council-113/media/scam-studies/bbb-movers-scam-study.pdf.

operation[.]"

Only meaningful penalties will possibly deter the numerous bad actors in the moving industry. Only serious consequences will possibly prevent fraudsters from preying on a large and particularly vulnerable population. Only a term of incarceration will possibly convince other corrupt movers to operate in accordance with the federal regulations designed to protect the millions of Americans who move each year.

The need for deterrence and to promote respect for the law supports a Guidelines sentence, particularly for the leader of the multi-year criminal enterprise that victimized thousands of people.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that a Guidelines sentence in this case is appropriate.

Dated:      Cincinnati, Ohio
                May 4, 2022

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

s/*Megan Gaffney Painter*
MATTHEW C. SINGER
MEGAN GAFFNEY PAINTER
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711

19

## CERTIFICATE OF SERVICE

      The undersigned attorney, duly admitted to represent the United States before this Court, hereby certifies that on the below date, she caused the Government's Sentencing Memorandum to be served on counsel for the defendant electronically.

Dated:      Cincinnati, Ohio
               May 5, 2022

                                                  Respectfully submitted,

                                                  /s/Megan Gaffney Painter
                                                  Megan Gaffney Painter
                                                  Assistant United States Attorney