UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 1:18CR109 |
| Plaintiff, | : | Judge Cole |
| v. | : | |
| ANDREY SHUKLIN, et al., | : | |
| Defendants. | : | |

**SENTENCING MEMORANDUM**

Now comes Defendant Andrey Shuklin, by and through counsel, and respectfully submits the following sentencing memorandum intended to assist this honorable Court in determining a sentence "sufficient, but not greater than necessary," to fulfill the sentencing purposes set forth in 18 U.S.C. § 3553(a). Mr. Shuklin pleaded guilty to one count of RICO Conspiracy, in violation of 18 U.S.C. § 1962(d).

**I.  FLIGHT FROM RUSSIA**

Mr. Shuklin was granted asylum on December 3, 2012. *See* exhibit A, asylum approval. He came to the U.S. from Russia in March of 2012 after fleeing Russia for his participation with the Russian United Democratic Party, also known as the Yabloko party. The Yabloko party is known as a Kremlin opponent.[1]  According to the Library of Congress, it is "[o]ne of the most high-profile

---

[1] Andrew Osborn, *Infighting erupts in Russia's anti-Kremlin opposition over Alexei Navalny*, Reuters, February 10, 2021, https://www.reuters.com/article/us-russia-politics-navalny-opposition/infighting-erupts-in-russias-anti-kremlin-opposition-over-alexei-navalny-idUSKBN2AA2EK.

opposition parties in Russia…"[2] The party "strives to follow the European model of political development by supporting a strong civil society and market economy. The party also works closely with many environmental and human rights groups, including those that support LGBT equality."[3] Navalny was a member until he was expelled in 2007.[4]

Mr. Shuklin fled Russia as a result of his involvement in pro-democracy protests. He worked in the legal department of the Yabloko party in the beginning of 2011 leading up to the March 4, 2012 presidential election. Through that work, he filed paperwork seeking approval to protest. He also participated in the protests. Putin's government arrested more than 300 opposition activists and bystanders.[5] During the 2012 Russian presidential election, "[o]pposition Yabloko Party head Grigoriy Yavlinkiy was disqualified by the CEC on the grounds that over 5% of the signatures he gathered were invalid. Many critics argued that he was eliminated because he would have been the only *bona fide* opposition candidate on the ballot."[6]

> On February 4, 2012, the "For Fair Elections" group sponsored peaceful protests in Moscow and other cities. Turnout in Moscow was estimated at 38,000 by police but up to 160,000 by the organizers. The protesters called for disqualified liberal candidate Grigory Yavlinsky (see below) to be permitted to run in the presidential election, the release of "political prisoners" such as Khodorkovsky, and legal reforms leading to new legislative and presidential elections.[7]

---

[2] *The Russian United Democratic Party "Yabloko" (Rossiiskaia ob"edinennaia demokraticheskaia partiia "Iabloko")*, Library of Congress, https://www.loc.gov/item/lcwaN0029041/ (last visited May 2, 2022).
[3] *Id.*
[4] *Id.*
[5] *Hundreds held in Russian election protests*, Amnesty International, December 5, 2011, https://www.amnesty.org/en/latest/news/2011/12/hundreds-held-russian-election-protests/.
[6] Jim Nichol, Specialist in Russian and Eurasion Affairs, *Russia's March 2012 Presidential Election: Outcome and Implications*, Congressional Research Service, March 14, 2012, https://sgp.fas.org/crs/row/R42407.pdf.
[7] *Russian Political, Economic, and Security Issues and U.S. Interests*, Congressional Research Service, May 8, 2006 – March 31, 2014, https://www.everycrsreport.com/reports/RL33407.html#_Toc384219208.

After Shuklin's name was found on the protest related paperwork he had filed, a threat was made against his daughter. He was told by a friend who worked for the Russian government that he should leave the country. He did on March 3. More arrests were made related to protests after the March 4, 2012 election.[8]

## II. ROLE IN THE INSTANT OFFENSE

### A. The beginning

Mr. Shuklin moved to Miami where he found a Russian speaking community. He spoke no English at the time. He met co-defendant Sergei Verlan in Miami. Verlan told Shuklin that, after six years in the moving business, he was opening his own moving company and needed an investor. Shuklin agreed and said he could get thirty to forty thousand for start-up funds from his family and from selling his Russian apartment. Verlan and Shuklin saw an ad for a moving company on Craig's list. They bought it and one truck. Shortly thereafter, they decided Verlan's Russian accent (Shuklin did not speak enough English at the time) was not good for business so they hired co-defendant Phyllis Quincones who had a history in the moving business.

### B. The offense conduct

Mr. Shuklin was involved in a criminal conspiracy and is deserving of significant punishment. That being said, his specific involvement in the various underlying activity that constitutes the required "pattern of racketeering" warrants consideration in determining the specific punishment appropriate for Mr. Shuklin.

As set forth in paragraph 25 of the Indictment, there were several types of criminal conduct at issue in this case. As for Mr. Shuklin's specific involvement, he was copied on emails with a fabricated images of driver's licenses. Although he did not create or send the image, unquestionably

---

[8] *Russia election: Police arrest 550 at city protests*, BBC News Europe, March 5, 2012,

3

he was aware of it and that it was fraudulent. Separately, he was involved in writing fake customer reviews. Further, he was also involved in restarting the enterprise under different names. He did direct Phyllis Quincones to start new companies under new names. He did not direct her to lie on the forms. He was unaware of the specific question on a form that asked, "Do you have now, or have you ever had, any relationship with any other FMCSA Regulated entity within the past 3 years?" He did not read English well enough to read and complete the form. Quincones did not tell him about this question or ask him for direction about how to answer the question. Contrary to the government's claims, the enterprise did not exist solely for the purpose of engaging in criminal activity. It is true, as the government stated in its response to the defendants' objections, that the enterprise would not have been able to continue to operate absent restarting itself as a new company to distance itself from bad customer reviews. It is true that such conduct is criminal and deserves punishment. It is also true that the enterprise made money on correctly-handled moves. The two are not mutually exclusive. Differentiating between 100% of the moves involving mistreatment of customers and a significantly lower percentage involving mistreatment of customers matters for sentencing purposes. None of these crimes are the heart of this case.

The heart of this case is the bad customer moves. Here, Shuklin is less culpable than some of the other co-defendants. By way of background, the enterprise was involved in moving people across states. First, the enterprise bought customer information, called a lead, from a leads company. Then, someone from the enterprise's sales department contacted the customer. Over the phone[9], the customer reported each item to be moved. The salesperson entered the information, by item, into a software system called Granot. Granot provides the actual cubic foot estimation for each item. The

---

https://www.bbc.com/news/world-europe-17265820.

[9] On a few occasions, a salesperson or a foreman would physically go out to the customer's house to collection information for the binding estimate.

salesperson completes the binding estimate by listing each item to be moved, the total estimated cubic feet of the total items (as provided by Granot), and any additional services that may be needed such as partial or full packing, additional stairs, and special parking arrangements. The customer was required to sign the binding estimate. The customer paid for the move in three installments. The first installment occurred as a deposit when the binding estimate was signed. The enterprise did not make any money at the time of the deposit. The funds went to the lead company, the salesperson, the credit card company, and the third-party carrier who would do the final stage of the move.

Ninety percent of the time, the salesperson created and accepted the binding estimate on his or her own without talking to anyone in management. The salespeople did have rules, including limits on the discounts they can provide to customers. If the salesperson wanted to give a bigger discount than permitted by the rules, the salesperson had to get management approval.

Once the customer signed the binding estimate, information regarding the move, particularly the estimated cubic feet, was sent to a foreman and a dispatcher. The foreman was an employee responsible for checking the software system to see when a move is scheduled, arranging for an appropriately sized moving vehicle(s) (in general, "moving truck"), arranging for helpers to assist with the move, and completing the transportation of items from the customer's home to a Company warehouse. Verlan was responsible for training and managing the foremen and running this part of the move process.

If, when the foreman arrived at a customer's home, the customer had items to be moved than were not accounted for on the binding estimate, the foreman filled out a revised estimate. The customers often (and reasonably)[10] had more items to be moved than were reported to the sales department. The foremen were told to do a revised estimate if there was the slightest increase in

---

[10] It is difficult to be 100% accurate reporting all furniture and property that has to be moved.

5

goods to be moved. This form should have been completed prior to any of the customers' items being loaded onto the moving truck. The revised estimate provided a new estimated cubic feet, per the foreman's visual estimation, and listed "additional goods" to be moved that were not included in the binding estimate. The customer signed this form and initialed two boxes. One of which stated: "[s]hipper moving more items/weight than was first anticipated." The other of which stated: "[r]evised total estimated charges was approved in totality in person/prior to loading."

Once all the customer's items were loaded onto the moving truck, the foreman completed a bill of lading and an inventory. The bill of lading listed the "base" cubic feet charged and the "additional" cubic feet charged. The additional cubic feet used on the bill of lading is based on the foreman's visual calculation of the space the items took up in the moving truck. An inventory was also filled out at the time. The inventory form should have listed every item that was moved. The customer signed both the bill of lading and the inventory. The foreman did have the ability to provide customer discounts on the bill of lading. The foreman was paid based on a percentage of the amount on the bill of lading. The customer paid the second installment at this time. The second installment should have been 50% of the remaining balance (now based on the bill of lading). Ten-percent of this installment went to the foreman. Additional fees covered labor for the helpers. Any fees collected as a result of stairs, or other moving difficulties, went directly to the foreman and helpers. Other fees covered packing materials. Generally, 7% of the total paid by customers went to the office.

The foreman transported the customers items to an enterprise warehouse to be unloaded. The third-party carriers would pick up the customer property from a warehouse and deliver it to its end destination. Because the third-party carrier had to reserve a set amount of space on its truck (and has thus foregone selling that space to another customer), they demanded advanced payment by the

cubic foot. Herein lies the difference between the footage charged to the customer and what was listed on paperwork related to securing the third-party transport. At the warehouse, the customer's property could be strategically packed and organized to take up as little space as possible. Once the items were unloaded and stacked on the warehouse floor, either the foreman or the warehouse manager filled out and signed the "Foreman Sheet." The Foreman Sheet listed "actual cubic footage." The "actual" or "real" (terms are used interchangeably) cubic feet is determined by how much space the customer items took up when stacked on the warehouse floor. The "actual" cubic feet were always less than the cubic feet on the bill of lading because the items were stacked more efficiently on the warehouse floor than they were stacked in the moving truck. Then, either the foreman or the warehouse manager sent all the customer paperwork to the "office." Shuklin received the paperwork at this time.

Lastly, the third-party carrier arrived at the warehouse to complete the move. At that time, the closing sheet was prepared. The third-party carrier delivered the customer items to the end destination.

The third customer installment was paid at the time of delivery. The enterprise required this third installment, the remaining balance, to be paid in cash. However, the enterprise would accept a wire transfer if the wire transfer is completed at least 24 hours prior to delivery. The cash policy is designed to prevent chargebacks.[11]

Shuklin did not devise the moving process. He did not train or supervise the foremen. He did not tell them or encourage them bump customer prices. The fact he was not in charge of those parts of the move does not excuse him of culpability. However, his role in the moving process and, additionally, his attempts to help customers should be taken into account.

When customers had complaints after their items were loaded and moved by the foreman, they would call customer support. Customer support would then bring the issue to Shuklin's attention. Bear in mind, when he receives the forms back in the office, the customer signed this form and initialed two boxes. One box stated: "[s]hipper moving more items/weight than was first anticipated." The other box stated: [r]evised total estimated charges was approved in totality in person/prior to loading." Consequently, Shuklin had no reason to know, prior to a customer complaint, when something had gone wrong. When he did learn about issues, he worked with customers to resolve them. He frequently gave discounts for customers who argued their price had been inflated. He also worked to stop the company from bumping customer prices. In an interview with the government, a co-defendant stated Shuklin "does not want them bumping customer prices anymore, although at one time that is how they thought the business was operated."[12] His efforts to help were far too little and too late to prevent harm to the customers and to avoid a significant punishment. That being said, they are worth considering with other factors in determining the appropriate prison sentence.

Separately, Mr. Shuklin's conduct post-raid helped customers. When the government raided the enterprise, customers who were currently in the process of being moved were stranded. Rather than flee the country or refuse to communicate with the government, Shuklin assisted the government with those stranded customers. Additionally, one manager at a warehouse in Maryland had encrypted customer move information. The government could not access the information. Accordingly they asked for help. Shuklin assisted in getting the information decrypted.

---

[11] A chargeback, as an example, is where a customer would call their credit card company to stop a payment before it was processed.
[12] At the Court's request, documentary support can be provided under seal.

8

### III. PERSONAL BACKGROUND

Overall, Shuklin had a positive childhood. Shuklin's parents divorced when he was five or six years old. His father left, leaving his mother with two children alone. She obtained a job that was two hours away from their home. As a result, she sent Shuklin to live with his grandparents. His older brother, four years his senior, stayed with his mom. Then, when he was thirteen years old, he lived at a military school. He would see his mother on the weekends when he was allowed to visit home on account of good grades. Later, his mother did not want him to have a career in the military. She pulled him out of military school when he was fifteen years old and put him in high school. Although he spent significant time away from his mother, he is grateful for the choices she made for his future. In Russia, all men are obligated to join the military unless they pursue a college degree and then pursue a Ph.D. Shuklin was in the process of a Ph.D program in economics when he was forced flee. *See* Exhibit B, certifications.[13]

Family and friends have written letters to this Court describing Shuklin's character. He is extremely involved in his family's life. He is incredibly supportive of his wife as well as charitable to those in need around him. *See* Exhibit C, Ltr from Tatiana Rakhmaninova. Andrey is supportive to his extended family as well. His mother-in-law writes: He has always been one of the most supportive persons in my life, who I could turn to every minute when I needed help. Exhibit D, Ltr from Irina Rakhmaninova. The family continues to struggle emotionally in Andrey's sustained absence.

Since seeking asylum in the United States from Russia in 2012, Andrey has also become an important figure in his community. As demonstrated by the numerous letters attached to this

---

[13] The translated certificates indicate Shuklin is a lawyer and has a jurisprudence certificate. This is a slight error in translation. Shuklin's certificate and education is more equivalent to a paralegal in

9

memorandum, Andrey is dedicated to his friends as he is to his family. Andrey has created a community in Florida to which he is very supportive and generous. He has financially supported struggling acquaintances, given people shelter in his home, and arranged professional help for a friend in crisis. *See* Exhibit E, Ltr from Dennis Katsman and Vera Khazanova; *see also* Exhibit F, additional ltrs from friends and family.[14] He is also described as hardworking, not only in his profession, but as someone who is willing to work on constantly improving himself as well. A long-time friend from Miami writes: "Andrey is a hardworking man. And we are not only talking about regular job but also about his ability to work on himself…After all what happened to him and his family, we are sure that he made the right conclusions and will never get himself into this kind of situation he is in right now again." Exhibit G, Ltr from Dmitry Pak and Julia Hayday.

      Those who have written letters asking this court for leniency can attest to Andrey's acceptance of responsibility and understanding of the seriousness of his crime. One friend writes: "Knowing Andrey, my wife and I think that the trauma of a punishment beyond what has already been given will have a diminishing intended effect compared to the damage it would cause to the lives of Andrey and his family." *See* Exhibit D. Andrey has already realized the gravity of his actions. Even during the time he has been in jail, Andrey is committed to becoming a better version of himself - learning Spanish, reading books, and educating himself – so that his past mistakes will not be repeated.

---

the U.S. system. He could work in the legal department of any company and work in arbitration. He could not work on behalf of private individual clients.

[14] For the letters that were written in Russia, the original letter as well as a translated version are included. The translated version immediately follows the version in Russian.

## IV. PUNISHMENT ENDURED TO DATE AND COLLATERAL CONSEQUENCES

### A. Incarceration during a pandemic

Shuklin has been detained for four years. He has not seen his family since then. Due to both COVID-19 and the expense of traveling here from Florida, his wife and young daughter have not been able to make the trip. Further, he is at a facility that does not offer programming or educational opportunities. *See* Exhibit H, ltr from Andrey Shuklin.

Shuklin is keenly aware of the impact his conduct has had on his family. He has limited contact with his fifteen-year-old daughter who lives in Russia. Shuklin is only able to speak to her when she visits Shuklin's mom during an opportune time to call. As for his youngest, she is now almost five years old. Shuklin has not seen her in four years. The grandmother who raised him passed away while he was in jail. His mother is a cancer survivor and is thus at high risk from COVID-19. *See* Exhibit I, Ltr from Shuklina Mariya. Now, his mother is reporting significant hardship due to Russia's invasion of Ukraine. She reports high prices and difficulty getting necessities. Shuklin feels guilty and devastated that he is here rather than working to help financially support his mom. These realities and the knowledge he caused them weigh more on him that any specific term of imprisonment.

### B. Shuklin faces deportation

The impact of this conviction on Mr. Shuklin's immigration status is unknown. Shuklin and undersigned counsel have consulted with an immigration attorney. It is theoretically possible that he succeeds in avoiding deportation. If he does not, it is up in the air as to whether he will be deported back to Russia or to another country, should one accept him with this criminal record. Mr. Shuklin's wife and child will still retain citizenship. The realistic possibility of being returned to Russia is made even more frightening by the developments of the last few months. Given the current political

climate, he will be at risk for significant danger and potential punishment. It is inevitable that he will have to fight this battle in immigration court. The issue here is what additional time should be served in a federal BOP facility beforehand.

## V. GUIDELINES

As noted in the objection letter attached to the final PSR, Shuklin has three objections that matter for Guidelines calculations. Rather than restate those objections here, those objections are incorporated herein. (PSR, Doc. 188, Page ID 996-1002). As a result of those objections, Shuklin asserts that his total offense level is 22. With a criminal history category of I, the Guideline imprisonment range is 41-51 months. In contrast, the final PSR, with an offense level of 30, has a range of 97 to 121 months. Practically speaking if given a 51-month sentence, when good time is taken into account, the actual sentence served is generally a little over 43 months. Shuklin has been detained for 46 months thus far.

## VI. CONCLUSION

For the reasons stated herein, Mr. Shuklin respectfully requests a downward variance to a sentence that this Court deems is sufficient, but not greater than necessary.

Respectfully submitted,

**/s/ Stephanie F. Kessler**
STEPHANIE F. KESSLER (0092338)
MARTIN S. PINALES (0024570)
Pinales, Stachler, Young & Burrell Co., LPA
455 Delta Ave., Suite 105
Cincinnati, Ohio 45226
(513) 252-2733
(513) 252-2751
mpinales@pinalesstachler.com

12

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served via this Court's electronic filing system on all counsel of record on this 4th day of May 2022.

/s/ Stephanie F. Kessler
STEPHANIE F. KESSLER (0092338)