```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION
                             -  -  -
 3

 4    UNITED STATES OF AMERICA,      :  Case No. 1:18-cr-109-1
                                     :
 5            Plaintiff,             :  Sentencing
                                     :  Tuesday, May 10, 2022
 6            - v -                  :
                                     :  1:00 p.m.
 7    ANDREY SHUKLIN, et al.,        :
                                     :
 8            Defendants.            :  Cincinnati, Ohio
                             -  -  -
 9                  TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE
10                           -  -  -

11    For the Plaintiff:         MATTHEW C. SINGER, ESQ.
                                 MEGAN GAFFNEY PAINTER, ESQ.
12                               U.S. Department of Justice
                                 U.S. Attorney's Office
13                               221 E. Fourth Street, Suite 400
                                 Cincinnati, Ohio  45202
14

15    For the Defendant:         MARTIN S. PINALES, ESQ.
                                 STEPHANIE F. KESSLER, ESQ.
16                               ERIC G. ECKES, ESQ.
                                 455 Delta Avenue, Suite 105
17                               Cincinnati, Ohio  45226

18

19    Law Clerk:                 Brian S. Pollock, Esq.

20    Courtroom Deputy:          Scott M. Lang

21    Court Reporter:            M. Sue Lopreato, RMR, CRR
                                 Potter Stewart U.S. Courthouse
21                               Southern District of Ohio
                                 100 East Fifth Street
22                               Cincinnati, Ohio  45202
                                 513.564.7679
23

24                           -  -  -

25
```

```
 1                        P R O C E E D I N G S

 2                   (In open court at 1:02 p.m.)

 3                            -  -  -

 4            THE COURT:  Good afternoon.  We're here this

 5   afternoon in open court and on the record in the matter of

 6   United States of America versus Andrey Shuklin.  It's case

 7   number 1:18-cr-109, and it's defendant 1.  It's the Court's

 8   understanding we're here this afternoon for purposes of

 9   sentencing.

10       Could I ask counsel to please enter their appearances for

11   the record.

12            MR. SINGER:  Good afternoon, Your Honor.  Matt Singer

13   and Megan Gaffney Painter for the United States.

14            THE COURT:  Good afternoon.

15            MR. PINALES:  For Mr. Shuklin, Your Honor, Mark

16   Pinales and Eric Eckes.

17       And we contacted the Court earlier, and Stephanie is in

18   my magic little box here.  And she is plugged in, but I want

19   to advise the Court there is no recording going on.

20            THE COURT:  Very good.  I appreciate that.  Thank

21   you, Mr. Pinales.  Good afternoon.

22       And, sir, are you Andrey Shuklin?

23            THE DEFENDANT:  Yes, sir.

24            THE COURT:  How would I correctly pronounce your

25   name?  Am I doing it right?
```

1          THE DEFENDANT:  You are.

2          THE COURT:  Very good.  And, sir, are you represented

3      in this proceeding by Martin Pinales, the attorney sitting

4      next to you?

5          THE DEFENDANT:  Yes.

6          THE COURT:  And, sir, we have an interpreter who is

7      present for you today.  Do you need an interpreter to

8      understand English, sir?

9          THE DEFENDANT:  In general, no, but if I will have

10     some problem, I will ask.

11         THE COURT:  Very good.  So there is an interpreter

12     who is available.  If you have any questions about anything

13     I'm saying and would like a translation, he will be able to

14     provide it for you.  But other than that, we won't use him

15     right from the get-go, all right, sir?

16         THE DEFENDANT:  Thank you.

17         THE COURT:  Very good.  We better swear in the

18     interpreter just in case we need him, Scott.

19     (Interpreter sworn.)

20         THE COURT:  Mr. Pinales, I'm correct, we're here for

21     sentencing in this matter?

22         MR. PINALES:  Yes, Your Honor.

23         THE COURT:  Okay.  So I anticipate proceeding as

24     follows.  It's first going to take me a few minutes to

25     establish the record for purposes of sentencing, and then

1    there are a number of disputes with regard to the sentencing

2    guidelines calculation.  I anticipate listening to the parties

3    with respect to those disputes and resolving those.

4         And then I anticipate listening to any statements that

5    the lawyers may wish to make with regard to sentencing once

6    we've determined the appropriate guideline range, as well as

7    any statement that Mr. Shuklin may wish to make, if he wishes

8    to make any.

9         So on January 25, 2021, the defendant, Andrey Shuklin,

10   appeared before this Court and pled guilty to one count of

11   Racketeer Influenced and Corrupt Organization, otherwise known

12   as RICO, Conspiracy, in violation of Title 18,

13   Section 1962(d), of the United States Code.  This charge was

14   contained in Count 1 of a document called an indictment.

15        In doing so, Mr. Shuklin pled guilty to a Class C felony,

16   providing a sentence of up to 20 years' imprisonment, up to

17   three years of supervised release, restitution, a $100 special

18   assessment, and a fine that is the greater of $250,000, or not

19   more than the greater of twice the gross gain or twice the

20   gross loss.  Mr. Shuklin's plea agreement also requires

21   forfeiture.

22        Mr. Shuklin pled guilty to that charge pursuant to a plea

23   agreement under Federal Rules of Criminal Procedure

24   11(c)(1)(A).  And, Mr. Shuklin, what that means is that the

25   plea agreement did not include an agreed sentence or even a

1    recommended sentence, but rather left sentencing to the

2    Court's discretion.

3         That said, the plea agreement did include some discussion

4    of the parties' view of the appropriate guidelines treatment,

5    a topic to which the Court will return in greater detail in a

6    bit.

7         Since the time the Court accepted Mr. Shuklin's plea, the

8    Court has received the probation office's initial presentence

9    investigation report filed on March 3, 2021, and the final

10   presentence investigation report filed on April 12, 2021.

11        The Court has also received sentencing memoranda from the

12   defense and the government, as well as their accompanying

13   exhibits, and a variety of victim impact statements.

14        Before proceeding further, I want to make sure that the

15   attorneys and Mr. Shuklin have received that information as

16   well.

17        Mr. Singer, have you received a copy of these documents?

18            MR. SINGER:  Yes, Your Honor.

19            THE COURT:  Mr. Pinales, have you received a copy of

20   these documents?

21            MR. PINALES:  Yes, Your Honor, and we have shared

22   them with our client.

23            THE COURT:  Very good.  And, Mr. Shuklin, have you

24   received a copy of these documents?

25            THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  And have you had an opportunity to

2     discuss these documents with Mr. Pinales?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Very good.  So at this point, I would

5     like to briefly discuss the factual findings that I will use

6     for Mr. Shuklin's sentencing.

7       First, I'll note Mr. Shuklin entered a Rule 11(c)(1)(C)

8     agreement, and that plea agreement contained a statement of

9     facts that Mr. Shuklin signed and admitted during the plea

10    hearing.  So absent any objection, I will rely on those facts.

11      Any objection from the government?

12          MR. SINGER:  No, Your Honor.

13          THE COURT:  Any objection from the defense?

14          MR. PINALES:  No, Your Honor.

15          THE COURT:  The facts in the statement of facts

16    attached to the plea agreement shall be included as part of

17    the record for sentencing.

18      Beyond that, ordinarily, I would also rely on the facts

19    contained in the presentence investigation report.  But before

20    doing so, I would note that Mr. Shuklin has objected to

21    certain factual findings in the report.

22      Some of those factual findings relate directly to the

23    guidelines calculations and, thus, might impact those

24    calculations.

25      The relevance of the other factual objections is less

1    clear to the Court, but the Court's suggestion would be to

2    address all of Mr. Shuklin's factual objections after the

3    Court explains the probation officer's guidelines calculation,

4    and we can talk about the extent to which we need to resolve

5    any of those factual objections.

6         So is that approach acceptable to the defense,

7    Mr. Pinales?

8              MR. PINALES:  Yes, Your Honor, but let me state to

9    the Court that we have spoken to Mr. Singer, and we're going

10   to submit on our objections and memorandum, Your Honor.

11             THE COURT:  So you don't anticipate arguing further

12   on any of the sentencing guidelines issues, Mr. Pinales?

13             MR. PINALES:  Yes, that is my understanding is that

14   both the government and I are submitting to the Court, because

15   I'm sure the Court has read it.

16             THE COURT:  I have read it, that is true.

17        Any objection to that approach from the government,

18   Mr. Singer?

19             MR. SINGER:  Your Honor, I had a conversation with

20   defense counsel.  We are prepared to rest on the un-objected

21   to statement of facts in the plea agreement, the statement of

22   facts that is in the PSR that support the enhancements.

23        To the extent the Court -- we do have a witness that is

24   present.

25             THE COURT:  Well, that's what I understood from your

1     filings, that you intended potentially to put on a witness

2     this afternoon, so I'm a little confused as to where things

3     stand now.

4          MR. SINGER:  We had intended to call the witness,

5     Your Honor, specifically to address the leadership enhancement

6     that is at issue.

7        After speaking with defense counsel, and our

8     understanding that they are not going to -- that they're going

9     to submit on the papers, we believe that what is before the

10    Court now is sufficient to support all of the enhancements.

11       However, if the Court would like additional facts to

12    support, in particular, the leadership enhancement, we do have

13    a witness that we're ready to put on.

14       But as we sit here, we are prepared to rest, given that

15    we believe that the facts that are before the Court are

16    sufficient to support the enhancement.

17         THE COURT:  So I'm a little confused at this point,

18    then, Mr. Singer.

19       I mean, so you're saying you're willing to rest on the

20    papers if the Court's going to rule in your favor, but if the

21    Court's not going to rule in your favor, you would like the

22    opportunity to put on a witness, or what are you saying?

23         MR. SINGER:  Well, Your Honor, we do have additional

24    facts that we are prepared to support.  We do not think they

25    are necessary.  We're in a position to rest on the facts as

1    they are.

2           THE COURT:  How long do you anticipate it would take

3    to put a witness on?

4           MR. SINGER:  Ten minutes.

5           THE COURT:  Oh, okay.  Well, I mean, I'm sort of not

6    inclined to, sort of, announce the ruling and then have the

7    government say, well, we've got additional facts we can put on

8    if the ruling happens to be in favor of the defendant.

9       So I would encourage you to put on whatever record you

10   want to create with regard to these issues, and then the Court

11   will move on and we'll move forward.

12      So if you have a witness here, that's fine.

13          MR. SINGER:  May I take a moment, Your Honor?

14          THE COURT:  You may.

15          MR. SINGER:  Okay.  Your Honor, we would call Special

16   Agent in charge of the U.S. Department of Justice, Andrea

17   Kropf.

18          THE COURT:  I think that's a good idea.  I think it

19   would maybe be more appropriate in about five minutes, so why

20   don't we do that then.

21          MR. SINGER:  Absolutely, Your Honor.  I

22   misunderstood.

23          THE COURT:  No.  That's fine.  I was just trying to

24   get our game plan here, so... all right.

25      So in terms of sentencing itself, under 18 United States

1  Code, Section 3553, the Court's job is to impose a sentence

2  that is sufficient but not greater than necessary to comply

3  with the purposes of sentencing.

4      I'm required to consider a number of factors in making

5  that determination.  For example, the statute requires me to

6  consider, among other factors, the nature and circumstances of

7  the offense, the history and characteristics of Mr. Shuklin,

8  the kinds of sentences available, and the sentencing range

9  proposed by the non-binding sentencing guidelines.

10      Before turning to the various other statutory sentencing

11  factors, I want to begin with the last example that I just

12  mentioned, which is the sentencing guidelines.

13      United States Sentencing Commission's sentencing

14  guidelines seeks to quantify the nature of the offense on one

15  hand and the defendant's criminal history on the other and,

16  based on that combination, it provides a recommended range of

17  sentences.

18      Although the sentencing guidelines do not bind my

19  decision, I'm still required to establish the guideline

20  calculations that the Court believes applies to Mr. Shuklin's

21  offense here.

22      Now, as my description suggests, this calculation rests

23  on what amounts to a graph with two axes.  The horizontal axis

24  is for prior criminal convictions, if any; the more of them,

25  the further out along that horizontal axis we go.

1           The vertical axis relates to the nature of the offense;

2     the more severe the offense, the further along that axis we

3     go.  And the result, created by the combination of the two,

4     will identify a box on the graph that identifies a recommended

5     sentence.

6           And I need to establish on the record the guideline

7     calculation or, in other words, sort of that box that applies

8     to Mr. Shuklin's offense here.

9           Now, that's not an entirely straightforward undertaking,

10    as Mr. Shuklin objects to aspects of the presentence

11    investigation report's recommended sentencing guidelines

12    calculation.

13          So I intend to proceed as follows.  First, I'll go

14    through the presentence investigation report's recommendation,

15    noting the areas of objection.

16          Then I'll discuss Mr. Shuklin's objections to the

17    presentence report and the government's responses.  And then

18    I'm going to give the government an opportunity to put on the

19    witness, as they just mentioned, and then hearing further

20    argument, although from Mr. Pinales, it sounds like the

21    parties may be resting on the arguments in their papers.

22          The base offense to which Mr. Shuklin has pled guilty is

23    one count of RICO Conspiracy, in violation of Title 18,

24    Section 1962(d), of the United States Code.  The guideline for

25    that violation is found in Section 2E1.1 of the sentencing

1   guidelines.

2       Under that section, the base offense level is either 19,

3   or the offense level applicable to the underlying racketeering

4   activity, whichever is higher.

5       The underlying racketeering activity applicable to

6   Mr. Shuklin is wire fraud, as he engaged in the emailing of

7   fraudulent documents to other coconspirators.

8       Wire fraud is governed by the United States Sentencing

9   Guidelines, Section 2B1.1.  And here the probation officer

10  found that the offense level applicable to wire fraud under

11  that section resulted in the higher guideline.  Thus, that is

12  the guideline that the PSR used to calculate the conduct in

13  this case.

14      According to Section 2B1.1(a)(1) of the guidelines, the

15  base offense level for wire fraud is seven.  Pursuant to

16  Section 2B1.1(b)(1)(I), 16 are added because of the loss at

17  issue here, which was a total of $2,467,807.39, exceeds

18  $1.5 million but was less than $3.5 million.

19      Pursuant to Section 2B1.1(b)(2)(A)(i), two levels are

20  added because the offense involved 10 or more victims.  In

21  accordance to the above, the adjusted offense level, then, for

22  the wire fraud predicate offense is a 25.

23      The report indicates that a further two levels should be

24  added, under Section 2B1.1(b)(10)(C), if the offense involved

25  sophisticated means.  Application Note 9(B) instructs that

1    sophisticated means encompasses especially complex or

2    especially intricate offense conduct pertaining to the

3    execution or concealment of the offense.  Here the report

4    found that the two-level increase was proper.

5        In that regard, the report notes that Mr. Shuklin

6    operated the moving enterprise out of the business address in

7    Hollywood, Florida.  However, he also operated the affiliated

8    companies associated with the moving enterprise in Ohio,

9    Maryland, North Carolina, Illinois, Texas, California,

10   Connecticut, Colorado, and Missouri.

11       Because the report found that Mr. Shuklin concealed the

12   offenses committed against the victims as he opened new moving

13   companies once a previous company was shut down by federal

14   investigators, this offense involved sophisticated means.  If

15   the Court accepts that application, that would increase the

16   offense level from 2 to 27.

17       As noted, Mr. Shuklin objects to this two-level

18   enhancement, and the Court will address that objection in a

19   moment.

20       Pursuant to Section 2B1.1(b)(ii), two levels are added if

21   the offense involved the production or trafficking of any

22   authentication feature.  Application Note 10(A) states that

23   authentication feature as the meaning given in 18 United

24   States Code, Section 1028(d)(1).  That statute, in turn,

25   defines authentication feature as any hologram, watermark,

1    certification, symbol, code, image, sequence of numbers or

2    letters, or other feature that either individually or in

3    combination with another feature is used by an issuing

4    authority on an identification document, document-making

5    implement, or means of identification to determine if the

6    document is counterfeit, altered, or otherwise falsified.

7        18 United States Code, Section 1028(d)(7) further states

8    that the term "means of identification" means any name or

9    number that may be used, alone or in conjunction with any

10   other information, to identify a specific individual,

11   including name, Social Security number, date of birth,

12   official state or government driver's license or

13   identification number, alien registration number, government

14   passport number, employer or taxpayer identification number.

15       Here the report found that this two-level increase should

16   apply.  Specifically, the report found that Mr. Shuklin, on at

17   least two occasions, and acting in concert with the other

18   members of the conspiracy, was altering other state-issued

19   driver's licenses in an effort to identify individuals as

20   owners of companies affiliated with the moving enterprise.

21       Therefore, according to the report, this offense,

22   involved with the production of an authentication feature and

23   a two-level increase, is appropriate, bringing the offense

24   level to 29.  Again, Mr. Shuklin has objected to that

25   two-level enhancement.

1      Finally, Section 3B1.1(a) instructs a four-level increase

2  is appropriate if the defendant was an organizer or a leader

3  of the criminal activity that involved five or more

4  participants.

5      And the report found that this four-level increase was

6  appropriate.  Specifically, the report found that Mr. Shuklin

7  was identified as the president of the moving enterprise, and

8  the conspiracy involved 11 codefendants and a number of

9  unidentified coconspirators.

10      The report also states that Mr. Shuklin coordinated and

11  directed lower level of employees of the moving enterprise and

12  other members of the conspiracy and associates of the

13  affiliated companies in a moving enterprise.

14      The report further observes that Mr. Shuklin was aware of

15  the illegal activities associated with the moving enterprise,

16  and was involved in email communication with other members of

17  the conspiracy in order to facilitate and further that

18  conspiracy.  Additionally, Mr. Shuklin benefitted financially

19  more than any other defendant.

20      Accordingly, the report found that a four-point increase

21  was appropriate, which would bring the total to 33.

22  Mr. Shuklin also objects to this four-point increase.

23      Finally, a three-level decrease is appropriate, pursuant

24  to Sections 3E1.1(a) and (b), based on Mr. Shuklin's

25  acceptance of responsibility and timely plea.  That means the

1   final offense level, as calculated by the probation officer,

2   is 30.

3       Next the Court observes that Mr. Shuklin has no previous

4   criminal history.  That means his criminal history score is

5   zero, and his criminal history category is one, which is the

6   lowest of the six categories.

7       Based upon a total offense level of 30 and a criminal

8   history category of one, the recommended sentence would be

9   97 to 121 months.  This range falls in Zone D of the

10  sentencing table.

11      United States Sentencing Guideline Section 5C1.1(f)

12  provides that if the applicable range is in Zone D of the

13  sentencing table, the minimum term shall be satisfied by a

14  sentence of imprisonment, meaning that the guidelines

15  recommend that Mr. Shuklin is ineligible for probation.

16      The maximum term of imprisonment, by statute, is

17  20 years.  The recommended term of supervised release under

18  the guidelines is one to three years.  By statute, the Court

19  may impose a term of supervised release of not more than three

20  years.

21      The statute also includes the potential for a fine.  And

22  under Title 18, Section 3571(b) and (d), the maximum fine is

23  twice the loss at issue or, in other words, a total of

24  $4,935,614.78.

25      The guidelines, meanwhile, suggest a fine range for this

1    offense from $30,000 to that $4.9 million number.

2        Under 18 United States Code, Section 3013, Mr. Shuklin

3    must pay a $100 mandatory special assessment.  And under

4    18 United States Code, Section 3663A, Mr. Shuklin must pay

5    restitution.  It's the Court's understanding that the total

6    amount of restitution remains under investigation at this

7    time.

8        Mr. Shuklin's plea agreement also provides for

9    forfeiture.

10        With that, I believe I've established on the record the

11    sentencing guidelines calculations and recommendations, and

12    with that, I now turn to Mr. Shuklin's objections.

13        First, as noted, Mr. Shuklin objects to a two-level

14    enhancement for use of sophisticated means.  In particular, he

15    argues that he did not relocate or participate in the

16    relocation of the scheme to another jurisdiction to evade law

17    enforcement or regulatory officials and, thus, he argues that

18    his conduct did not involve sophisticated means.

19        So as to that objection, does defense counsel wish to be

20    heard beyond their papers, Mr. Pinales?

21            MR. PINALES:  No, Your Honor.

22            THE COURT:  Does the government wish to be heard on

23    that issue?

24            MR. SINGER:  No, Your Honor.

25            THE COURT:  Very good.  So next Mr. Shuklin objects

1    to the two-level enhancement the probation officer applied for

2    producing or trafficking of an authentication feature.  That

3    enhancement was based on the probation officer's finding that

4    Mr. Shuklin altered state-issued driver's licenses in an

5    effort to identify individuals as owners of companies

6    affiliated with the moving enterprise.

7        Mr. Shuklin objects he did not alter state issued

8    driver's licenses and, thus, this enhancement is not

9    appropriate.

10       Mr. Pinales, do you wish to be heard further as to that

11   objection?

12           MR. PINALES:  No, Your Honor.

13           THE COURT:  Does the government wish to be heard

14   further?

15           MR. SINGER:  No, Your Honor.

16           THE COURT:  And, Mr. Pinales, am I correct that your

17   principal objection on that front is that Mr. Shuklin is not

18   personally involved in that activity, or what do you mean "he

19   wasn't involved"?

20       I mean, I've seen the emails in which he receives at

21   least one, I think it was two, driver's licenses that had been

22   altered to change the name of the person identified on the

23   driver's license.

24           MR. PINALES:  Yes, Your Honor.  He did receive them

25   but he didn't do them.

1          THE COURT:  I understand that, but does it have to be

2     the defendant, or isn't it just that the offense involved the

3     use of all of it?

4          MR. PINALES:  I submit on our memorandum, Your Honor.

5          THE COURT:  Okay.  And, Mr. Singer, I take it it's

6     the government's position that it doesn't really matter if a

7     given conspirator was involved, but rather the question is

8     whether the offense involved the conduct?

9          MR. SINGER:  That's correct, Your Honor.

10          THE COURT:  Yes.  I think that's correct, and I'm

11     going to apply that enhancement.

12      I should have also made clear on the first one that I do

13     believe that the enhancement for use of a sophisticated means

14     is appropriate, given the web of various companies that were

15     set up, and the ways in which they were located.

16      I think there was an effort made to sort of stay one step

17     ahead of the regulators by creating various fictitious

18     entities and/or non-fictitious entities as successors to

19     companies that were going out of business, changing locations,

20     and all of that, so I do believe that enhancement applies.

21      So then there's the final enhancement, which is

22     Mr. Shuklin objects to the four-level enhancement applied for

23     leading or organizing a criminal activity of five or more

24     participants.  He argues that he was not the president of all

25     the affiliated companies.  He acknowledges he had a leadership

1   role in certain aspects of the moving enterprise, but notes

2   that this enhancement applies to organizers or leaders of,

3   quote, criminal activity.

4       He maintains that his involvement in and awareness of the

5   criminal activity varied and, overall, does not warrant an

6   organizer or leader enhancement.

7       Probation officer stated that Mr. Shuklin was the

8   president, and notes that he coordinated and directed

9   lower-level employees, other members of the conspiracy, and

10  associates of the affiliated companies, and that he was aware

11  of the illegal activities associated with the moving

12  enterprise, and was involved in email communications with

13  other members of the conspiracy in order to facilitate and

14  further the conspiracy.

15      And then he also benefitted financially more than the

16  other defendants, which is a fact that the Court also has to

17  take into account.

18      I take it, Mr. Pinales, you don't have anything further

19  you want to add on that topic?

20          MR. PINALES:  I have nothing to add, but I would like

21  the ability of cross-examining the agent.

22          THE COURT:  Absolutely.

23      And, Mr. Singer, now I believe would be an appropriate

24  time to call your witness if you wish to supplement the

25  factual record.

1          MR. SINGER:  Your Honor, I apologize for

2     flip-flopping on this and going back and forth.  We're not

3     going to present additional evidence, but we'd like the

4     opportunity to present additional argument, if that's --

5          THE COURT:  You may.  This would be the appropriate

6     time for that as well.

7          MR. SINGER:  Your Honor, the government has presented

8     evidence attached to the sentencing memos.  I'm not going to

9     repeat that here, but I would like to highlight certain facts

10    that are in the statement of facts and certain facts in the

11    PSR that I think establish this enhancement.

12       The defendant admitted he owned the affiliated companies

13    that made up the moving enterprise while he was working there;

14    that the businesses were doing business in Florida, where he

15    was working.

16       He admitted that it was the practice and scheme of the

17    moving enterprise to provide material lists, material false

18    statements to regulators, to third-party customers, and this

19    facilitated the fraudulent scheme.

20       He admitted that the enterprise reincarnated into

21    numerous new companies while he was the owner and working for

22    the enterprise.

23       In paragraph 51 of the PSR, this is an uncontested

24    paragraph for the statement of facts.  It makes clear that his

25    name is on the bank accounts; that he was benefiting more than

1    any other member of the enterprise during the period.  Again,

2    these are uncontested facts.  And, in fact, he was using money

3    from the proceeds of the enterprise through the bank accounts

4    that he was -- had access to pay his mortgage.

5         So this is the owner of the enterprise, who is working at

6    the main business location, knowing that the enterprise is

7    committing fraud, having control over the bank records, and

8    using the bank records, the funds in the bank accounts for his

9    own personal needs, I think, one of the most material facts,

10   set of facts that are in the statement of facts.

11        So the defendant admits in the PSR objections that he

12   was -- had a leadership role in certain aspects of the

13   enterprise, but the statement of facts states that he made --

14   the enterprise made misrepresentations to federal authorities,

15   made misrepresentations to the fraudulent ideas that we've

16   already discussed in the other enhancements, made

17   misrepresentations to customers and the Department of

18   Transportation, lied about the cubic feet, extorted customers

19   and overcharged customers.  That's the entire breadth of the

20   enterprise.

21        That is the functioning of the moving company;

22   interactions with the Department of Transportation,

23   interactions with customers, interactions with third parties

24   that they relied on to make the enterprise work.

25        He was the leadership.  He was in a leadership role, and

1    he admits he was in a leadership role with regard to the

2    company.  That was the company.

3        The company was based on fraud.  It was based on

4    misrepresentations.  So I believe that, based on the facts

5    that are before the Court now, this enhancement is

6    sufficiently supported.

7            THE COURT:  Thank you, Mr. Singer.

8        Mr. Pinales, do you wish to be heard?

9            MR. PINALES:  Yes, briefly, Your Honor.  I think, in

10   reading the agent's reports, in reading the PSR, and in

11   looking at the totality of this, we're not arguing with the

12   Court that he was a leader.  We don't believe he was the

13   kingpin.  And we note that it is --

14           THE COURT:  Well, can't there be more than one

15   leader?  Can't there be more than one person who --

16           MR. PINALES:  I believe there certainly can be more

17   than one leader and, in this case, I think there was more than

18   one leader.  But if we're going to stack them against each

19   other, he is a lesser leader than one of the other leaders.

20           THE COURT:  And I appreciate that.  But under the

21   guidelines, it seems to me the question is whether he falls

22   within the category of leader.  And you've already admitted

23   more than one person may fall into that category.  But I think

24   once you're in there, it isn't like somebody gets four,

25   somebody gets three, and somebody gets two, right?  It's

1    either you're in the category or you're not.

2         MR. PINALES:  I hear you, but I want the Court to

3    understand that it's very uncontested, throughout all of the

4    reports that when he came and when he started into this

5    company, he didn't even speak English.

6         I mean, he came to this country not speaking English.

7    He's learned English since he's been here, but I believe that

8    he was used.  That's about the best way I can relate that.

9    I'm not stating he wasn't a leader.  I don't think he was the

10   leader.

11        THE COURT:  And I think that that kind of comes

12   through.  I don't know that I would even push back too hard

13   against that.  I guess the question before the Court is

14   whether, under the sentencing guidelines, someone who is a

15   leader, even if not necessarily the leader, still qualifies

16   for a four-level enhancement.

17        And I think the way I read the sentencing guidelines, it

18   appears to me that anyone who is entitled the label of

19   "leader" qualifies for the four-level enhancement.

20        And so, Mr. Pinales, notwithstanding your argument, and

21   notwithstanding my appreciation for the facts that you've

22   raised, the Court concludes that the four-level enhancement

23   for being a leader was appropriately applied under the

24   presentence report.

25        So it's the Court's intention to use the presentence

1    report calculation, and that the applicable offense level for

2    the offense here that the Court will use is 30, and the

3    criminal history category is one, as I've already noted.  I

4    don't think there's any dispute about that.

5         So based on that, the Court concludes that the advisory

6    guideline sentencing range, and I stress it is only advisory,

7    is 97 to 121 months.

8         I don't believe there's any need to address any of the

9    other factual objections that have been raised in the parties'

10   papers, although to the extent the parties want to refer to

11   their versions of the facts in connection with any comments

12   they may wish to make about sentencing, they are certainly

13   free to do so.

14        But, Mr. Pinales, in your view, is there any reason we

15   need to go line by line through those factual objections?

16             MR. PINALES:  Not at all, Your Honor.

17             THE COURT:  Very good.  So with that, I think I've

18   established the guidelines calculation that I intend to use on

19   the record, and I am prepared to hear from the parties with

20   regard to sentencing itself.

21        Mr. Singer, does the government wish to be heard on the

22   matter of sentencing?

23             MR. SINGER:  Yes, Your Honor.

24             THE COURT:  Very good.

25             MR. SINGER:  Your Honor, the government believes that

1    a guideline sentence is appropriate here.  Like I just
2    mentioned, the fraud in this enterprise was pervasive.  It was
3    part of every aspect of how it operated.
4        And I think stepping back and viewing what occurred
5    through the eyes of the customer is an important process here.
6    The Court has received victim impact statements from a number
7    of victims.
8        And I'll start that by saying this process of
9    reincarnation, reincarnate carriers, bumping after goods are
10   loaded, hostage-type situations, this is pervasive in the
11   industry.
12       And the individuals who started this, the defendant and
13   others, they didn't make this up, but they learned it.  They
14   saw what the industry was doing, and they embraced it.
15       And they embraced it for many years, despite the fact
16   that they knew that regulators were looking at them, they knew
17   they were being investigated.  There was a search warrant in
18   2017 at the premises.
19       FBI and Department of Transportation came in, took a
20   bunch of evidence, interviewed people and, despite that, they
21   continued doing the exact same thing.  They continued
22   reincarnating into new entities, planning for the next
23   company.
24       Coming back to the customer.  We have a person who has no
25   background in the moving industry.  They don't know one

1    company from the next.  They all look the same.  They all know

2    that it's going to be expensive, and they know that they're

3    going to be moving their most precious goods.

4        They are relying on the companies who are in this

5    position of authority who can, you know, charge what they

6    want, and the customer really has to rely on the

7    representations that they're getting from this company.

8        And they have to rely on what they read from the

9    Department of Transportation.  Is this a legitimate company?

10   Is this DOT number that allows them to move household goods,

11   is this legitimate?  Are they the type of company that I can

12   trust my goods with?  Those are all lies.

13       Oftentimes, these customers picked this company because

14   they got a good deal on the front end.  They got a nice load

15   quote, they beat the competition.  And what they saw online

16   supported the fact that this was a legitimate company that was

17   going to do them well.

18       They signed the binding contract, which is what they

19   believed, based on what they knew and researched, that this

20   was not going to move.  This was not going to change.  I know

21   what I'm going to pay.  I'm going to owe $5,000 for this move.

22   I've budgeted it.  This is what I'm going to do.

23       What happens completely floors them.  The company shows

24   up, they load the goods on to the truck, and all of the sudden

25   everything changes.  They no longer have possession of all

1    their worldly possessions.  They no longer have possession of

2    the things that they care -- the possessions that they care

3    most about, and they're told that they have to pay more.  They

4    have to pay an additional cost to get those goods back if they

5    want them.

6        And this happened time and time and time again.  What

7    they didn't know is that the -- that price that they were

8    being charged wasn't even real, it was fake; that the whole

9    system that it had created incentivized the foreman, who was

10   on the scene, to bump that up because he was going to get paid

11   more.  He was going to get paid based on the charged cubic

12   feet, the false cubic feet, so he's jacking up the price at

13   every turn.

14       The customer doesn't know that.  A lot of these

15   customers, these victims, they don't know that now.  They

16   don't even know that they paid more.  But hundreds and

17   hundreds and hundreds of emails internally between the foremen

18   of the warehouses all over the country, going back to the

19   defendant, and he's seeing this is what they're charged, and

20   this is the cubic footage that they're charged for having, and

21   this is what they actually have.

22       All of this extortion, all of this fraud, the customers,

23   the ones who did know and were able to complain to get the

24   Department of Transportation to intervene and to place

25   entities out of service, it didn't really matter because they

1    had another company in their back pocket that they were going

2    to reincarnate.  And this was the business motto, and it

3    happened over and over and over again, and a lot of these

4    people, some of these people never got their goods.

5          THE COURT:  Mr. Singer, in some ways -- you know, I

6    hear everything you're saying.  In some ways, it strikes the

7    Court like these were commercial transactions done under

8    shady, false pretenses.

9       You know, part of me says, gosh, it seems more like a

10   civil wrong than a criminal wrong, you know, and we start

11   talking about putting people in prison for extended periods of

12   time.

13      I guess I just wanted to solicit your views as is the

14   RICO statute being used -- as you said, this is a common

15   practice in this industry.

16      Is the government sort of cracking down on this industry?

17   Is this an industry where RICO's being used more generally, or

18   is this, sort of, like an unfortunate example of somebody who

19   got caught in a RICO case that the government typically

20   wouldn't charge as a RICO case?

21         MR. SINGER:  This case was charged as a RICO case,

22   Your Honor, because --

23         THE COURT:  I know that.

24         MR. SINGER:  I'm going to explain why it was charged

25   as a RICO case.  It fits the model of -- first of all, the

1    racketeering statute does not say it has to be a mob boss.

2              THE COURT:  I understand.

3              MR. SINGER:  There has to be certain factors that are

4    involved.  And one of the factors, the reason it's appropriate

5    is because the people at the top aren't the ones who are

6    actually on the ground committing the crimes.  They're just

7    overseeing all the crimes that are being committed and are

8    benefiting from it.

9         So when Congress drafted the RICO statute, they

10   anticipated that wire fraud would be an aspect of that, and so

11   yes, there are -- the RICO statute being used in fraud mover

12   cases like this?  I don't know of any.

13             THE COURT:  Well, I mean, I think your sentencing

14   memoranda referred to the practices that were at issue here

15   is, sort of, common and pervasive throughout this industry.

16        I guess I'm wondering if that's the case.  Is the

17   government bringing other RICO cases against other moving

18   companies or not?

19             MR. SINGER:  It's very fact specific, Your Honor,

20   whether or not -- there was a big case that was just brought

21   in the Eastern District of Pennsylvania several months ago.  I

22   spoke to the prosecutor.  She didn't bring it as a

23   racketeering case because the facts supported proving it

24   through a substantive wire fraud conspiracy.  The facts in

25   this case supported a racketeering --

1        THE COURT:  Well, independent of the label, the

2    criminal label that's used, whether it be wire fraud or some

3    other kind of fraud, or RICO or whatever, I mean, are moving

4    companies that operate in this fashion being criminally

5    prosecuted?

6        MR. SINGER:  Yes, they are, Your Honor.  They are.

7        THE COURT:  Okay.  And, to your knowledge, one of the

8    factors the Court's going to talk about in a little bit is

9    that, you know, the Court has some responsibility to make sure

10   that similarly situated people who engage in similar conduct

11   receive somewhat similar sentences.

12     One thing that was notably absent from, I think, either

13   parties' sentencing memorandum was suggestions to the Court

14   about how similar conduct has been treated in other cases

15   around the country.

16     I know there's references to the sentencing guidelines.

17   But I mean more specifically to what's labeled in your

18   sentencing memorandum as a "common practice," I mean, what are

19   the typical sentences in cases like these?

20       MR. SINGER:  I don't know, Your Honor.  Honestly, I

21   don't know.  There aren't a lot of examples.  There aren't.  I

22   mean, cases have been brought recently, but I can't say that

23   I'm aware of a lot of the sentences that have resulted from

24   them.

25       THE COURT:  So there haven't been a lot of cases?

1          MR. SINGER:  There are pending cases.

2          THE COURT:  I see.

3          MR. SINGER:  But ones that have been -- worked their

4    way through the system, I'm sure there are, I'm just not

5    prepared to speak on them.

6          THE COURT:  Very good.  I'm sorry.  I didn't mean to

7    interrupt where you were going, Mr. Singer.

8          MR. SINGER:  No, Your Honor.  I appreciate the

9    question.

10        I think it is important to note that this type of fraud,

11   it is -- I mean, aside from the facts that it satisfies the

12   elements of wire fraud, among others, the reason that it is

13   necessary to charge these as criminal cases, and it's

14   necessary to charge them based on the full scope of the

15   criminal activity, is because it's -- each individual customer

16   loses, on the worst case, a couple grand.

17        THE COURT:  Sure.

18        MR. SINGER:  Or on the best case, you know, a couple

19   grand.  They get bumped a little bit, probably not worth their

20   time to even address it.

21        On the worst case, though, they never get any of their

22   goods, and they are left with little ability to ever get that

23   money back or their possessions.  They're not going to get

24   their mementos, their household goods, their baby pictures.

25   That's gone.

1    But they're also never going to be made whole from a

2  monetary standpoint.  The companies, they reincarnated a newer

3  company.  There is no civil mechanism to get this back.  These

4  are customers who are victimized, and they have nowhere to

5  turn.

6    So I think that these are important cases.  And I think a

7  sentence that recognizes the real issue that this is in the

8  moving industry throughout the country, and the real impact

9  that this is having on victims throughout the country, I think

10  it's an important fact that the Court --

11    THE COURT:  And I noted that one of the things that

12  you described in your sentencing memorandum was -- I'll

13  paraphrase, but kind of the importance of signalling to others

14  engaged in similar conduct, sort of, the gravity of the

15  offense that they're committing.

16    I guess I wonder in that regard, I mean, you know, is a

17  72-month sentence, versus a 97-month sentence, versus an

18  84-month sentence, versus a 124-month sentence, I mean, I

19  would assume that for people engaged in this kind of conduct

20  in the moving industry generally, that any sentence measured

21  in terms of multiple of years is going to be seen as a, you

22  know, relatively stern signal about the potential consequences

23  of their behavior in which they're engaged.

24    Why 97 or 120 months?  I know that's what the sentencing

25  guidelines recommends, I'm just not sure that when they put

1    this all together, that the sentencing guidelines were

2    contemplating the losses being losses from certain fraudulent

3    moves, versus maybe other kinds of activity that we can think

4    of being engaged in through a RICO Conspiracy.

5         MR. SINGER:  Your Honor, I think that's an issue

6    across the criminal code.  I mean, you can find -- there are

7    lively debates about the value of deterrents as far as

8    sentencing goes, and whether or not it deters the drug dealer

9    in a drug case, or the guy who is running guns, or the

10    fraudulent mover, there are varying opinions on whether or not

11    that any one sentence is going to deter a criminal's behavior.

12        I do think, though, in this particular context, where we

13    have a -- you know, this is more of a white collar industry,

14    and I think that people who are involved in the moving

15    industry take note when one of their own, who are doing

16    activities that's similar to what they're doing, is faced with

17    a very stiff sentence.

18         THE COURT:  No, I don't doubt that at all.  I guess I

19    just wondered in the sentence, if you'll just excuse the pun

20    you just said, what does "very stiff sentence" mean?

21         MR. SINGER:  Our guidelines are the guidelines,

22    Your Honor.

23         THE COURT:  All right.  Thank you, Mr. Singer.

24       Mr. Pinales, do you wish to be heard with regard to

25    sentencing?

1          MR. PINALES:  Yes, I do, Your Honor.  We are not

2     arguing that this is not a RICO.  The facts of this case can

3     be squeezed into the RICO statute.  By that I mean we still

4     rely upon Your Honor to reach a sentence which is appropriate

5     but not greater than necessary.

6          I want to talk about the deterrents for a few moments and

7     advise the Court that in July, it will be four years since

8     Andrey has been arrested.

9          Now, he's been housed in the Butler County Jail.  His

10    wife is in the courtroom today.  Because of the distance and

11    the cost, this is the first time they have actually seen each

12    other in person.

13         She brought with her a picture, which I've given to

14    Andrey, which is of his daughter.  And we talked about that in

15    the memorandum.  She is five years old now.  For four years,

16    he has not seen her.

17         The conditions in the Butler County Jail are county jail.

18    It is not a federal institution.  And by that I mean there is

19    much difference.  It is the equivalent of what would be, in a

20    federal institution, hard time.

21         And the reason it is hard time, he sees the light of day

22    when he comes to court.  They do not have any outdoor

23    activity, or they're not allowed out.  Yes, he can work out,

24    and he has worked out, but it is not the kind of incarceration

25    that we expect in a federal institution, nor is it the kind of

1    incarceration that he will receive.  And he knows that he is

2    going to receive a sentence, Your Honor.

3        And so he has had an extremely hard time in the Butler

4    County Jail.  I know the Court's going to remedy that by

5    giving him a sentence and he's not going to be in the Butler

6    County Jail, but I would like the Court to take into

7    consideration that for all of four years, he has had hard

8    time.

9        And we have supplied in our memorandum the situation of

10   Andrey's status in the United States.

11       I'd like to state to the Court that he went to college in

12   Russia and received what would be somewhat the equivalent of a

13   law degree, but he's never taken a bar exam, so he's never

14   been a lawyer.

15       But it has placed him, when he was in Russia, in a

16   position of being around a group of people where he was, sort

17   of, advising them and helping them do demonstrations in the

18   Soviet Union and in Russia.

19       And because of that, he got out, fortunately, and

20   received status here under the consideration of the United

21   States Government, which is what he has now.  He is not a

22   U.S. citizen.

23       Now, I have spoken to a number of immigration lawyers,

24   because that's an area well out of my range.  When Andrey is

25   finished with his sentence, the government will make a

1    determination as to what to do with him.  I would say

2    normally, it would be a deportation.  Under this status that

3    he has now, he can be deported back to Russia, which would be

4    a death sentence for him, he's convinced of that, particularly

5    with Russia today.

6              THE COURT:  Actually, if I could stop you there,

7    Mr. Pinales.  I mean, I'm wondering why are you asking for a

8    short sentence?  It seems like, at least as long as he's

9    serving a term of imprisonment, he will be here.

10             MR. PINALES:  I know, Your Honor.  It's a two-way

11   sword.  And I understand that.  But I think it is more likely

12   than not, after his sentence is over, immigration will have a

13   determination as to, one, are they going to deport him, or are

14   they going to continue his status.  And it could go either

15   way.  If they decide to deport him, the next question is

16   where.

17        It's my understanding that he could be deported to

18   another country that this -- that our country has a

19   relationship with that is not part of the Soviet former union;

20   that it would be another country that is willing to accept

21   him.  I don't know.  We don't know.  But that is certainly

22   something holding a greater punishment than if he was a

23   U.S. citizen, do your time, go home to your family.  And I'd

24   like the Court to take that into some consideration.  How it

25   plays, I don't know.

1     And I thought the very question or comment that the Court

2     raised to me, give him the longest possible sentence and he

3     doesn't have to worry about being deported to Russia at that

4     point, but he's going to be.  He's young enough that he's

5     going to be.

6     Now, I'm asking that the Court, as I said, take into

7     consideration the Butler County situation, the fact of his

8     really wonderful past.

9     I mean, I have seen a lot of letters from a lot of people

10    over my career, but I have rarely seen such genuine letters

11    that support and love and care for him, care for Andrey.

12    THE COURT:  If I could interrupt you on that for a

13    second, Mr. Pinales.  I mean, one thing that concerns the

14    Court that I'm trying to reconcile.  So I get these, as you

15    said, letters from friends, neighbors, about what a wonderful

16    person Mr. Shuklin is, and then I get hundreds of pages of

17    victim impact statements from others who have had dealings

18    with Mr. Shuklin.

19    And I guess one thing that the Court is left with is this

20    impression that it's great to be Mr. Shuklin's friend, but not

21    so good to be Mr. Shuklin's customer; and, you know, that some

22    of the largesse that he demonstrates with his friends is sort

23    of underwritten by the unfortunate circumstances of many of

24    his customers.  And I'm trying to reconcile those two things.

25    If you have thoughts in that regard, I'd appreciate it.

1          MR. PINALES:  I wish I had a magic wand that could

2     change the facts, but I can't.  We recognize the injuries that

3     have been caused.  We also recognize the law that states that

4     the Court -- whatever sentence the Court does give, he's going

5     to be under a supervised release.

6          And certainly, Andrey expects that under that supervised

7     release, he will begin working his backside off to do whatever

8     he can as to make proper restitution, Your Honor.

9          And will it make these people whole in the amounts that

10    have been there?  I don't know.  But I would hope he will do

11    his absolute best to compensate some of these victims.  I

12    don't know if that answers your questions.

13         THE COURT:  It does.  I mean, I guess -- so one way,

14    you know, as I looked at the sentencing memorandum, I was

15    trying to take a holistic view of Mr. Shuklin's life.

16         One impression that kind of comes across is that he has

17    some reasons that he needed to leave Russia, and -- not

18    illicit.  I mean, in some ways, good reasons, right?  I mean,

19    he's involved in protests against some of the things that are

20    going on over there.

21         And so he ends up here and comes to our shores.  And the

22    country kind of takes him in, and he responds by engaging in,

23    sort of, widespread fraudulent conduct that ended up not only

24    depriving people of money in certain circumstances, but

25    depriving them of memories, and photographs, and all the

1     things that sort of document a family's history, some of their

2     dearest possessions, and it's just -- it's hard to reconcile

3     all these different visions of Mr. Shuklin from all these

4     different angles.

5          But I think you would agree, it's a little sad that

6     somebody who has the opportunity to come here, and has an

7     educational background that should put him in a position to be

8     a contributor in society, instead, chooses to pursue the path

9     that he pursued.  I'm troubled by that, to be honest.

10             MR. PINALES:  And I can't argue with the Court on

11    that.  And I think my client can't argue with the Court on

12    that.  But he can and certainly has, as I said, with his

13    incarceration to date, seen the errors of his ways.

14         And I submit, with the support of his family, this Court

15    won't see him again.  Thank you.

16             THE COURT:  Thank you, Mr. Pinales.

17         Mr. Shuklin, sir, you are not required to speak, but if

18    you would like to make a statement, this would be an

19    appropriate time to do so.

20             THE DEFENDANT:  Yes, Your Honor.  Thank you for

21    letting me speak, Your Honor.

22         First of all, I want to apologize to customers of the

23    company, to these people.  I don't know if somebody here today

24    and, unfortunately, I cannot do it directly for everybody, but

25    I hope Mr. Singer will convey my words to these people.

1          I want to say that I'm really sorry about all this

2     situation, what happened, what kind of experience they had.

3          I want to say that all this time when I spend in jail, I

4     was praying for forgiveness, and I really, really hope that

5     after these words, these words at least will make them feel

6     better.

7          I understand it's not enough, but I hope, in future, I

8     can do more to, I don't know, to cover what I -- the damage

9     happened to them, because I promise that I will try my best to

10    do.

11         I also want to apologize to Court, Your Honor, to

12    government, to my family, to my wife.  I want to say I'm

13    really sorry for the hardship, what I brought to you, to our

14    family.  And I also want to say thank you to you that, no

15    matter what, you standing by me, and it really means a lot to

16    me.  I will never forget it.

17         Your Honor, I will not justify myself today because I

18    admit I made the wrong decisions in my life.  And you check

19    and see that it's the biggest mistake what I make.

20         I just want to say that if purpose of jail is to make a

21    person realize what he did wrong and correct him, in this

22    case, I want to assure you that it's exactly what happened to

23    me.

24         I learned my lesson.  I realized that it's no amount of

25    money can buy me a single second of time with the people who I

1    love, my family, my wife, my daughters, especially the little

2    one, Paulina. Next month, she will turn five, and she doesn't

3    even know me. For her, I'm just a character on the phone.

4    And every time when she's asking me when I come back home,

5    it's just killing me inside.

6        And I know for sure that I will never, ever again

7    jeopardize her happiness and any, any member of my family

8    happiness never again.

9        You know, in one book, I read words each -- I want to

10    make, I'm not going to say mantra for all my life, the rest of

11    my life. The words says, "Better ask permission first than

12    forgiveness later." And I want to say that that is exactly

13    what I am going to do in the future. I will always ask

14    permission first.

15        Your Honor, I know my guidelines is high, and then I see

16    the government asking to give me a lot of time today. But I

17    know you are the person who deciding today, and that's why I'm

18    asking you.

19        And I know I'm asking big thing. I'm asking you to

20    believe in me, to believe in the person who made the mistake

21    and regret and will regret until the end of my life of the

22    damage what I made. But I'm asking you for a second chance;

23    second chance to return to society, to my family, to be good

24    examples for my kids, to dedicate my life to be a better

25    person, and to fix everything where I may.

1       And if you give me this second chance, for me it's going

2   to be one of the biggest maturation of my life, knowing that

3   you trust me, and I will prove everybody that your decision

4   was right and accurate about me, and I promise you, Your

5   Honor, I will not let you down.

6       Thank you.

7       THE COURT:  Thank you, Mr. Shuklin.

8       Are there any victims present in court who would like to

9   speak to sentencing?

10      Is there anyone who would like to speak to sentencing

11  generally?  All right.

12      Mr. Pinales, did you say that this July would mark

13  48 months?

14      MR. PINALES:  Yes, Your Honor.  I believe it's the

15  31st.  I could be wrong on the date, but it is this July.

16      THE COURT:  Andrey Shuklin stands before the Court

17  after pleading guilty to Racketeering Influenced and Corrupt

18  Organizations Conspiracy, in violation of Title 18,

19  Section 1962(d), of the United States Code.

20      As noted, at this juncture, the Court's job is to impose

21  a sentence that is sufficient but not greater than necessary

22  to comply with the purposes of sentencing.

23      In doing so, the Court must look at the nature of the

24  offense, and the history and characteristics of the defendant

25  and, based on that, the Court must fashion a sentence that

1    reflects the seriousness of the offense but adequately deters

2    criminal conduct, that protects the public from further crimes

3    by this defendant, and that provides the defendant with needed

4    educational or vocational training, medical care, or other

5    correctional treatment.

6        I'd like to talk about some of those factors a little bit

7    and start with the nature of the offense.

8        Here there's no doubt that criminal activity occurred.

9    The moving enterprise described in the indictment enriched its

10   owners, operators, employers, members, and associates by

11   defrauding, extorting, and stealing from customers who hired

12   the affiliated companies to move their household goods.

13       The individuals also worked to promote and perpetuate the

14   moving enterprise, and to shield its criminal affairs from law

15   enforcement and customers by concealing the true owners,

16   operators, employees, and operations of the affiliated

17   companies.

18       There's little question that Mr. Shuklin was aware of the

19   affiliated companies that made up the moving enterprise, that

20   they worked out of the moving enterprise's main business

21   office in Florida.  In fact, it appears that Mr. Shuklin has

22   been with the moving enterprise right from its inception.

23       And in connection with his activities with the moving

24   enterprise, he knew that it was the practice and scheme of the

25   moving enterprise to provide materially false statements to

1    federal regulators, to third-party companies, and to

2    customers.

3        He further knew it was the practice of the moving

4    enterprise to charge customers for moving more cubic footage

5    of household than were actually loaded by members of the

6    moving enterprise, and he furthered and facilitated this

7    fraudulent scheme.

8        He was also aware of the actual amount of space that was

9    used by the customers, which was less than what they were

10   charging the customers for.  Email communications show his

11   knowledge of and participation in the fraudulent scheme.

12       In short, it appears that Mr. Shuklin occupied the

13   highest ranks of the moving enterprise, and it was a moving

14   enterprise that cost nearly 1,900 victims at least

15   $2.4 million.

16       And as the Court's already noted, I've received victim

17   impact statements from a whole host of people who have had the

18   unfortunate experience of dealing with the moving enterprise

19   in one guise or another or in one iteration or another, and

20   their stories were, frankly, troubling.

21       I mean, it was people who lost a lifetime's worth of

22   possessions, and not just possessions like beds and couches

23   and furniture, but possessions that were personal to those

24   people; pictures, photo albums, important family documents.

25       You know, Mr. Shuklin, the activities of the moving

1    enterprise really had a detrimental effect on the lives of a

2    lot of people.  And I get this wasn't a crime of violence but,

3    at the same time, it did in some ways do violence to the

4    families who were deprived of some of these very deeply

5    cherished goods.  And the Court just doesn't think this is

6    something that can be taken lightly.

7        To a certain extent, I agree with the government.  You

8    know, they point out this appears to be a common practice in

9    the industry, but it's so hard to know which way that cuts.

10       I mean, on the one hand, I guess, maybe it seemed like

11   less of a big step to walk down that path.  At the same time,

12   though, it does seem like it's important that people

13   understand that -- and others engaged in these activities

14   understand it is significant, and it is criminal behavior, and

15   I think a significant sentence is warranted to try and send a

16   message to others who would do that as well.

17       And that's one of the purposes of sentencing under

18   18 United States Code, Section 3553, is to think about the

19   need for deterrence, and so that's an issue that has weighed

20   on the Court's mind.

21       With regard to Mr. Shuklin's background, as Mr. Pinales

22   noted, he was born in Russia.  He's well educated.  He has a

23   degree in jurisprudence from the Moscow Financial Academy.  He

24   began work on a Ph.D. in economics, and then had to leave the

25   country when he sought political asylum in the United States

1    due to his association with the opposition party in Russia.

2        And, you know, again, as I've pointed out to Mr. Pinales,

3    that's sort of a double-edged sword.  I get that you come to a

4    new country, as Mr. Pinales said, you don't speak English as

5    well as you could.  At the time, I'm sure it was difficult;

6    but, at the same time, given this real opportunity, you turn

7    around and start down a path of criminal behavior that extends

8    for years.

9        I mean, it wasn't an inadvertent choice that you

10   recognized and then corrected.  This was conduct in which you

11   engaged for years.

12       It doesn't appear that Mr. Shuklin has any mental health

13   or substance abuse issues.  And it does come through to the

14   Court that he has a loving family life, and that he is, as

15   Mr. Pinales noted this afternoon, well liked in his community.

16       But that's a double-edged sword too.  Sometimes the Court

17   has before it people who had no advantages in childhood, and

18   they came out of desperate circumstances and made choices that

19   reflected that very limited choice set that they had.  And in

20   some ways, that seems like a mitigating factor.

21       Here, Mr. Shuklin, it appears that you could have chosen

22   to contribute in this country in a variety of different ways,

23   and the one you chose was the one we've just discussed and,

24   you know, it's a little hard to understand how you ended up

25   where you were, given where you started.

1  At the end of the day, I do think that a significant

2 sentence is warranted here.  That being said, I do think the

3 guidelines are a little harsh considering the nature of the

4 offense at issue here.

5  As I noted, I think the RICO statute has -- the coverage

6 of the RICO statute has grown over the decades to include some

7 things that maybe Congress didn't originally contemplate.

8  But that being said, I have no doubt that a RICO

9 violation was proven here by the facts that were admitted in

10 the plea agreement.

11  But I do think that the sentencing -- the recommended

12 sentence under the sentencing guidelines is, perhaps, longer

13 than is necessary, in light of the conduct at issue here, in

14 part, because I think it's important that Mr. Shuklin get out

15 so that he can start attempting to do his part to repay the

16 customers who the moving enterprise has harmed through their

17 interactions with him.

18  So for all the reasons that I've mentioned during this

19 hearing, I find that a sentence of 78 months is sufficient but

20 not greater than necessary to comply with the purposes of

21 sentencing.

22  It's a relatively significant downward variance from the

23 sentencing guidelines but, for all the reasons I mentioned, I

24 do believe the downward variance is appropriate here.

25  I also find that a term of supervised release of three

1    years is appropriate, in part, because some of the conditions

2    that I'm going to talk about are directed at Mr. Shuklin's

3    financial activities when he's released from prison, and I do

4    want to make sure that he is making efforts to undertake the

5    restitution that the Court will also order as a part of this

6    sentence.

7        But before I move on and describe the terms of supervised

8    release, Mr. Pinales, do you have a request for where I would

9    recommend to the Bureau of Prisons that he serve his term of

10   incarceration?

11             MR. PINALES:  I do, Your Honor.  If the Court would

12   recommend -- and I've explained that it's merely a

13   recommendation.

14             THE COURT:  The Court is using the word "recommend"

15   in a very --

16             MR. PINALES:  Yes, but they try and do the best they

17   can because keeping a family together is paramount.  I would

18   ask that an institution in southern Florida, as close to his

19   home and to his wife as is possible.

20             THE COURT:  Where is she located, sir?

21             MR. PINALES:  In the Miami area.

22             THE COURT:  Okay.  So the Court will recommend that

23   he serve his term of incarceration at a facility located as

24   close to Miami, Florida as possible.  As I noted, I'm also

25   sentencing Mr. Shuklin to a three-year term of supervised

1    release.

2         And in that regard, Mr. Shuklin, I'll note that while on

3    supervised release, you must not commit another federal,

4    state, or local crime.  You are prohibited from possessing a

5    firearm, ammunition, destructive device, dangerous weapon, or

6    unlawful controlled substance, and you are prohibited from the

7    unlawful use of any controlled substance.

8         That being said, the Court finds that there is a low risk

9    of future substance abuse on the part of this defendant and,

10   therefore, pursuant to 18 United States Code, Section 3583(d),

11   the Court waives the requirement of mandatory drug testing.

12        I should also note, since I failed to do that at the

13   outset and I apologize, that the 48-month sentence -- it's the

14   Court's intention that there be credit for time served on

15   that.  And the sentence will reflect credit for time served,

16   which is the Court's understanding is roughly 48 months at

17   this point.

18        Certainly, back now to the supervised release,

19   Mr. Shuklin, you must also cooperate in the collection of your

20   DNA as directed by the probation office.  And you must comply

21   with the standard conditions of supervised release that have

22   been adopted by this Court.

23        I believe that you have to report within 72 hours to the

24   probation office that's located in the district in which you

25   are incarcerated upon your release from incarceration, so I

1    just advise you to do that.

2        Because of the nature of your crime here and the fact

3    that you owe mandatory restitution, the Court is going to add

4    certain special conditions that are directed at your finances

5    while on supervised release.

6        In particular, the Court orders that the defendant must

7    not incur any new credit charges or open additional lines of

8    credit without the approval of the probation officer.

9        The defendant must provide the probation officer with

10   access to any requested financial information, and authorize

11   the release of any requested financial information, which the

12   probation office may share with the United States Attorney's

13   Office.

14       The defendant shall comply with the orders of the

15   Department of Homeland Security, Immigration, and Customs

16   Enforcement.  If deported, the defendant shall not illegally

17   reenter the United States.

18       With regard to fines and restitution, the Court starts by

19   noting that Mr. Shuklin is required to pay the mandatory

20   special assessment fee of $100.

21       Although the Court has the authority to impose a fine

22   under 18 United States Code, Section 3571, the Court finds

23   that Mr. Shuklin lacks the financial ability to pay that fine,

24   especially in light of the substantial restitution that the

25   Court is going to order and, therefore, the Court declines to

1    impose an additional fine.

2        In particular, Mr. Shuklin, to the extent that you are

3    able to amass financial means through employment or otherwise,

4    the Court would prefer that money go to restitution to the

5    victims of the moving enterprise rather than to payment of a

6    fine.

7        As to restitution of the victims.  Pursuant to Title 18,

8    Section 3663A of the United States Code, restitution is

9    mandatory.  The Court thus orders such restitution, which

10   shall be due immediately, with any unpaid balance to be paid

11   as a condition of supervised release.

12       Mr. Shuklin shall pay restitution jointly and severally

13   with the other defendants in this case, but the Court does not

14   yet have an amount for that restitution and will amend the

15   sentence to include the amount upon its determination.

16       In that regard, I note the government has filed a motion

17   in this case to set the restitution at the completion of the

18   sentencing of all the conspirators in this case, and the Court

19   anticipates ruling on that motion shortly.

20       But it is the Court's intent to amend the sentence in

21   this case to include a specific amount of restitution, and the

22   timing of that amendment, I think, the Court will enter in

23   response to the government 's motion.

24       While Mr. Shuklin is incarcerated, if he's working in a

25   non-UNICOR or grade five UNICOR job, he shall pay $25.00 per

1    quarter toward the restitution or special assessment

2    obligation.

3        If working in a grade one through four UNICOR job,

4    Mr. Shuklin shall pay 50 percent of his monthly pay toward

5    restitution obligation or special assessment.  Any change in

6    this schedule shall be made only by the order of this Court.

7        Within 60 days of the commencement of the term of

8    supervised release, the probation officer shall recommend a

9    payment schedule to the Court to satisfy any unpaid balance of

10   the restitution, and the Court will enter an order at that

11   point establishing a schedule of payments.

12       In his plea agreement, Mr. Shuklin also agreed to forfeit

13   certain property.  Specifically, he agreed to the immediate

14   forfeiture, pursuant to 18 United States Code, Section 1963,

15   of any interest acquired or maintained in violation of

16   18 United States Code, Section 1962, which interests are

17   subject to forfeiture to the United States pursuant to

18   18 United States Code, Section 1963(a)(1).

19       Any interest in, security of, claim against, or property

20   or contractual right of any kind affording a source of

21   influence over any enterprise which the defendant established,

22   operated, controlled, conducted, or participated in the

23   conduct of, in violation of 18 United States Code,

24   Section 1962, which interests, securities, claims, and rights

25   are subject to forfeiture to the United States pursuant to

1    18 United States Code, Section 1963(a)(2).

2       And finally, any property constituting or derived from

3    any proceeds obtained, directly or indirectly, from

4    racketeering activity or unlawful debt collection, in

5    violation of 18 United States Code, Section 1962, which

6    property is subject to forfeiture to the United States under

7    18 United States Code, Section 1963(a)(3).

8       Pursuant to 18 United States Code, Section 3612(f)(3)(A),

9    the Court waives the requirement of interest on any balance of

10    restitution not paid within 15 days after judgment.

11       So with that, I have stated the sentence that I intend to

12    impose on Mr. Shuklin, and I must now ask if there are any

13    procedural or substantive objections to the sentence that have

14    not been raised.

15       Any objection from the government?

16       MR. SINGER:  No objection, Your Honor.  One point of

17    clarification?

18       THE COURT:  Yes.

19       MR. SINGER:  And I might have misheard.  I apologize

20    if I did.  I believe you made a reference to 48 months'

21    imprisonment.

22       THE COURT:  78.

23       MR. SINGER:  It's 78 months?

24       THE COURT:  Yes.

25       MR. SINGER:  The 48 months is a reference to --

1          THE COURT:  The time that I believed he's already

2    served, and for which the Court's intent that he receive

3    credit for time served, yes.

4          MR. SINGER:  Thank you, Your Honor.

5          THE COURT:  I thought I said that, but if I didn't,

6    it's a 78-months sentence and credit for time served.  Either

7    way, I should have said it in the first instance and didn't.

8        With that clarification, any objection from the

9    government, Mr. Singer?

10          MR. SINGER:  No, Your Honor.

11          THE COURT:  Mr. Pinales?

12          MR. PINALES:  No, Your Honor.  And I understood that

13    what the Court stated needed no clarification.  I understood

14    that, so...

15          THE COURT:  Thank you for that clarification,

16    Mr. Pinales.

17          MR. PINALES:  Thank you.

18          THE COURT:  Okay.  So the Court's previously stated

19    sentence shall be docketed as a final judgment.

20        So, Mr. Shuklin, what happened here this afternoon is,

21    per your request, I have imposed a sentence that is below the

22    guideline sentence.

23        Please do not take that as any kind of indication by the

24    Court that I think your conduct was appropriate or okay or not

25    criminal, or anything of the like.

1          As I said, I received an awful lot of letters from people

2     who, from what the Court can tell, were pretty significantly

3     damaged by the conduct that you undertook through your

4     participation in and leadership of the moving enterprise, and

5     I hope, hope, hope that you are being honest with the Court

6     when you say that you have learned your lesson and that you

7     will do what you can to try to repay the people who have been

8     harmed by your activity.

9          The Court does not impose a term of imprisonment lightly.

10    I understand you have a family.  I understand you have a young

11    daughter, and I hope that you will be able soon to be back

12    with them.

13         The Court has imposed a term of imprisonment but with

14    credit toward -- sort of good time credit and credit for time

15    served, I think you will be able to be back with your family

16    relatively quickly.

17         I hope that you will not find yourself in a situation

18    where you need to be separated from your family again because

19    of poor choices, and I hope that this is a turning point.

20         I can't predict in any way what's going to happen with

21    regard to immigration consequences.  That's just kind of

22    again, unfortunately, the reality of the situation in which

23    you've placed yourself.  So that's another question that can

24    only be answered, I guess, in the fullness of time, but I hope

25    that things work out for you in that regard.

1          With that, Mr. Shuklin, the last thing I'd like to talk

2     to you a little about this afternoon is your right to an

3     appeal.  I know you may have waived your right to appeal in

4     your plea agreement, but I'm nonetheless required to inform

5     you that if you wish to appeal my sentence, you must file a

6     notice of appeal within 14 days of entry of judgement.

7          So subject to any waivers that are contained in the plea

8     agreement, I'm hereby notifying both parties that you have the

9     right to appeal this Court's sentence.

10          Mr. Shuklin, if you are indigent and cannot retain an

11     attorney, you may apply for one, which the Court will then

12     appoint to represent you on your appeal.

13          In accordance with the provisions of Rule 4(B) of the

14     Rules of Appellate Procedure, I'm advising you that you must

15     file your notice of appeal with the clerk of the United States

16     District Court; in other words, this Court, within 14 days of

17     the Court filing its judgment.

18          Mr. Pinales, are you retained or appointed?  I'm sorry.

19               MR. PINALES:  We, at this point, are appointed.

20               THE COURT:  Very good.  So if you request, I will ask

21     Mr. Pinales to help you with that one-page document and that

22     alone.  So let me ask you, sir, do you request that I order an

23     appeal be filed?

24               THE DEFENDANT:  No.

25               THE COURT:  Mr. Pinales, if Mr. Shuklin changes his

1    mind, will you protect his rights?

2         MR. PINALES:  Absolutely.

3         THE COURT:  Very good.  The last topic on the Court's

4    agenda is Mr. Shuklin's custodial status.  It's my

5    understanding, as we've discussed, that Mr. Shuklin is

6    currently detained.

7         Does the government wish to say anything further on the

8    matter regarding his custodial status pending assignment by

9    the Bureau of Prisons?

10        MR. SINGER:  No, Your Honor.

11        THE COURT:  Mr. Pinales, do you have anything you

12   wish to add?

13        MR. PINALES:  No, Your Honor.

14        THE COURT:  Very good.  So the Court is going to

15   order that Mr. Shuklin be remanded to the marshals and

16   returned to detention pending his assignment by the Bureau of

17   Prisons.

18        With that, is there anything further that counsel wish to

19   place upon the record before we close the hearing this

20   afternoon?

21        MR. SINGER:  No, Your Honor.  Thank you.

22        MR. PINALES:  No, Your Honor.  Thank you.

23        (Proceedings concluded at 2:23 p.m.)

24                    -  -  -

25              C E R T I F I C A T E

1                          -   -   -

2          I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
   is a correct transcript from the record of proceedings in the
3   above-entitled matter.

4

5   /s/ M. Sue Lopreato_____                    June 2, 2022_____
   M. SUE LOPREATO, RMR, CRR
6   Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25