## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

                               **Case No. 1:18-cr-109**

  **v.**

                               **JUDGE DOUGLAS R. COLE**

**ANDREY SHULKIN, et al.,**

      **Defendants.**

## OPINION AND ORDER

In this criminal matter, twelve defendants were each indicted on one count of engaging in a criminal racketeering conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d). (Doc. 3). The Court has since accepted pleas from, and imposed sentences on, the nine parties who, to date, have been apprehended by authorities—Defendants Andrey Shuklin, Serghei Verlan, Phyllis Ricci Quincoces, Vladimir Pestereanu, Ievgen Kariaka, Akhliddin Kalonov, Roman Iakovlev, Jessica Martin, and Seth Nezat (collectively Defendants). But a question remains for the Court relating to one aspect of their sentences: restitution. That is because, as part of all the sentences imposed, the Court entered judgments holding each defendant jointly and severally liable for the restitution owed under the Mandatory Victim Restitution Act (MVRA). (Docs. 168, 246). But the Court deferred ruling on *the amount* of such restitution until after all apprehended parties had been sentenced and the government had sufficient evidence underlying the

victims' losses. (Doc. 246). The government has now moved on behalf of 87 victims for the Court to finalize the Defendants' sentences by ordering restitution in the amount of $735,185.75. (Docs. 297, 305).

As explained below, the Court **GRANTS IN PART** the Government's Motion for Restitution Order (Doc. 297) and **ORDERS** Shuklin, Verlan, Quincoces, Pestereanu, Kariaka, Kalonov, Iakovlev, Martin, and Nezat **jointly and severally liable for restitution in the amount of $735,185.75** to be paid to victims according to the schedule set forth in the separately filed Appendix to this Opinion and Order.

### BACKGROUND[1]

On July 25, 2018, the grand jury indicted twelve individuals (the nine Defendants, along with Evgenia Kukuy, Sanjar Fayziyev, and Sergey Bocharov) for engaging in a criminal conspiracy in violation of RICO. (Doc. 3). As alleged in the indictment and later confirmed by Defendants' plea agreements,[2] from approximately

---

[1] As the Court noted, there are three Defendants indicted in this RICO conspiracy—Evgenia Kukuy, Sanjar Fayziyev, and Sergey Bocharov—who remain fugitives. As a result, they have not been tried or convicted of any of the charges listed in the indictment nor are they subject to any sentence. For that simple reason, the Court's decision today in no way affects their cases. In other words, the Court's recitation of details of this conspiracy are not to be misunderstood as established facts or proof of the guilt or innocence of Kukuy, Fayziyev, or Bocharov. Rather, these facts are established only as to those Defendants who have been found guilty and sentenced for this RICO conspiracy, based on their agreement to these facts as part of their respective signed plea agreements. Consistent with that understanding, the Court draws the facts for this background section from those signed plea agreements. And similarly, because Kukuy, Fayziyev, and Bocharov have not been convicted, the Court lacks the authority to enter a restitution order against them. Simply, the decision today impacts the sentences of only those who have been found guilty, convicted, and sentenced.

[2] The statements of facts in the plea agreements laying out these details mirror the indictment's allegations. (Doc. 136, #695–97; Doc. 149, #756–57; Doc. 164, #851–52; Doc. 170, #881–83; Doc. 183, #907–09; Doc. 187, #1101–02; Doc. 206, #1191–93; Doc. 228, #1424–25). And although Verlan pleaded to the indictment, (Doc. 261), his admissions during his change-

2013 until 2018, Defendants operated various moving companies that they advertised as reputable businesses but used to bilk clients out of money. (Doc. 168, #868). The racketeering scheme involved various businesses—all run by Defendants—that took possession of clients' household goods and then demanded higher prices (often based on inflated measures of the cubic footage of truck space actually used in moving a customer's household goods) than the original contract price. (*Id.*). Defendants essentially held the goods for ransom by refusing to deliver them until the customer paid the higher prices. (*Id.*). And even when the customers would finally acquiesce and pay that higher price, the enterprise often delivered goods late or not at all. (*Id.* at #868–69). Beyond that, to avoid detection and prosecution for this fraudulent activity, Defendants formed several new companies and used new identities in connection with those enterprises. (*Id.* at #869).

Following their arrests and pretrial proceedings, all nine apprehended Defendants ultimately pleaded guilty to the single RICO count in the indictment. (Docs. 136, 149, 164, 170, 183, 187, 206, 228, 261). And from September 2020 until March 2023, the Court sentenced each for their part in this racketeering scheme and entered judgments. (Docs. 166, 198, 221, 238, 241, 271, 279, 291, 294).

Before the matter was reassigned to the undersigned and after the first Defendant's sentencing, the then-assigned judge issued an order setting forth the procedures he intended to use to determine the proper amount of restitution owed. (Doc. 168). That November 25, 2020, Order explained that 18 U.S.C. § 3664(d)(5)

---

of-plea hearing regarding the factual basis for his guilty plea similarly reflect the allegations in the indictment. (Doc. 268, #1851–73).

3

generally requires a court to ascertain the amount of restitution owed within 90 days of a defendant's sentencing. (Doc. 168, #871). But it noted that the Supreme Court has permitted sentencing courts to enter restitution orders beyond that timeframe so long as the sentencing court provided timely notice that restitution will be imposed at a defendant's sentencing and held open only the amount to be calculated at a later date. (*Id.* at #871–72 (citing *Dolan v. United States*, 560 U.S. 605 (2010))). So the Order explained that the Court would proceed to sentence all apprehended Defendants, would impose restitution at each sentencing using a conservative estimate based on the evidence proffered by the government, and would enter a final order identifying the victims and the actual amount of restitution owed at the end of the case. (*Id.* at #873).

The matter was reassigned to the undersigned the same day. (Doc. 169). The undersigned then presided over two additional sentencings at which hearings the Court ordered Nezat and Pestereanu jointly and severally liable for the full restitution amount to be ascertained later. (Docs. 197, 198; Doc. 221, #1393; Doc. 246, #1628; *see also* Doc. 189, #1038, 1041). Considering the Court's handling of those sentencings and the difficulty of defining the restitution amounts piecemeal (given Defendants would all be held jointly and severally liable for the total amount), the government moved to have the Court modify the restitution procedures set forth in the November 25, 2020, Order. (Doc. 223). On May 25, 2022, the undersigned granted that motion. (Doc. 246). The Court, evaluating the provisions of the MVRA, again concluded that Supreme Court caselaw authorized the Court to enter a final order of

4

restitution outside the 90-day window found in 18 U.S.C. § 3664(d)(5), so long as the Court provided notice at a defendant's sentencing that restitution would in fact be imposed (leaving only the amount open). (Doc. 246, #1629–30). And the Court agreed with the government that a single determination of the restitution amount after all apprehended Defendants were sentenced made better administrative sense. (*See id.* at #1630). So it concluded that it would hold all apprehended Defendants jointly and severally liable for any restitution obligation imposed at their sentencings without requiring proof of—or setting—the exact amount of such restitution owed at that time. Rather, after all had been sentenced and once the government had proof of the victims' losses, the Court would enter an order reflecting the total restitution value for which the sentenced Defendants would be jointly and severally liable. (*Id.*).

At each of the remaining sentencing hearings, in line with the undersigned's May 25, 2022, Order, the Court imposed restitution as part of the sentence and stated that the restitution obligation would be joint and several, but deferred establishing the loss amount itself until after the last apprehended defendant was sentenced. (Doc. 238, #1601–02; Doc. 241, #1617–18; Doc. 260, #1784; Doc. 271, #1895; Doc. 272, #1897; Doc. 279, #2007–08; Doc. 291, #2069–70; Doc. 294, #2081–82). The last sentencing was held on March 29, 2023. (Doc. 293). Around seven months later, the government finally moved for the Court to set the restitution amount. (Doc. 297). Its motion explained its process for contacting potential victims, its verification of the evidence those victims proffered to prove the value of their losses, and its

5

methodology for calculating what costs are properly owed as restitution. (*Id.* at #2094–98). No party responded to this motion within the time specified by local rule.

But the Court had questions about the government's explanation and the evidence it proffered. In particular, the Court was uncertain about the propriety of the government's exclusion of any money that had already been paid by insurance companies from each victim's calculated loss, given 18 U.S.C. § 3664(f)(1)(B) requires courts not to consider "the fact that a victim has received … compensation with respect to a loss from insurance or any other source … in determining the amount of restitution." And the Court had concerns that the government's measure of the victims' losses was based on the ill-gotten gains Defendants had received because of the scheme (a disgorgement theory), even though the Supreme Court has made clear that the provisions in Title 18 of the United States Code use restitution in the sense of "restoring someone to a position he occupied before a particular event." *Hughey v. United States*, 495 U.S. 411, 416 (1990) (analyzing the language of the MVRA); *cf. United States v. Higgins*, No. 22-3538, 2023 WL 6536752, at *12–*13 (6th Cir. Oct. 6, 2023) ("District courts therefore 'may not use the defendant's gain to approximate the victim's loss unless the government establishes such a correlation that the defendant's gain can act as a *measure of-—not a substitute for*—the victim's loss.'" (quoting *United States v. Hills*, 27 F.4th 1155, 1202 (6th Cir. 2022))). Finally, the Court noted that the government had excluded secondary costs, such as a victim's "lost wages," (Doc. 297, #2097), or the "cost[s] for furniture while the[] [victim] waited," (Doc. 297-2, #2104), even though they appeared to be monies expended only

6

because of the crime and thus recoverable under the Supreme Court's definition of restitution.

So it met with the parties on April 17, 2024, to ask for clarification and to lay out the additional information the government needed to provide. (4/17/24 Min. Entry). At that conference, counsel for several Defendants, who had declined to respond to the motion earlier, sought leave of the Court to file untimely responses. So the Court set a deadline for Defendants to file their responses raising any objections they then thought fit to raise and for the government to file its reply with the additional information that had been discussed at the conference. (*Id.*).

Three Defendants (Martin, Pestereanu, and Kalonov) responded. (Docs. 301, 302, 303). Martin's filing, styled as a motion, requests apportionment of the restitution award among Defendants and an order that any restitution she owes is to be paid periodically in nominal amounts. (Doc. 301, #2119). Pestereanu's filing makes two arguments: (1) the Court should apportion the restitution award and (2) it lacks jurisdiction to enter a restitution order because it has been more than 90 days since his sentence and he has since completed his probation. (Doc. 302, #2121–22). Finally, Kalonov (like the other two responding Defendants) seeks an order apportioning the restitution award rather than holding him jointly and severally liable. (Doc. 303, #2124). None of these filings expressly acknowledged the Court's prior judgments in each of their cases holding them jointly and severally liable for the ultimate restitution award. The government then replied. (Doc. 305). It addressed the Court's concerns raised at the status conference, (*id.* at #2129–31), responded to the three

Defendants that had filed briefs, (*id.* at #2132–34), and provided an updated spreadsheet and declaration from the case's investigative agent (Brian Christ) providing evidence of the losses of the identified victims and explaining in greater detail the process for calculating those numbers, (*id.* at #2132, Docs. 305-1, -2).[3]

The matter is ripe for review.

## LEGAL STANDARD

As already noted a few times, Defendants' restitution obligations are governed by the MVRA. (Doc. 168, #870–72; Doc. 246, #1629). Such restitution is mandatory (unsurprising given the MVRA's title includes the word "mandatory"). 18 U.S.C. § 3663A(a)(1) ("[W]hen sentencing a defendant convicted of an [applicable] offense … the court shall order, in addition to … any other penalty authorized by law, that the defendant make restitution to the victim of the offense"); *United States v. Kilpatrick*, 798 F.3d 365, 388 (6th Cir. 2015) (applying the MVRA in a RICO case). Victims must be compensated for "the full amount of their … losses caused by the conduct underlying the offense conviction," which losses the government must prove

---

[3] In its reply (and in response to the Court's concerns), the government revised its requested restitution amount, which revised total is about $30,000 less than the amount originally listed in its motion. (*Compare* Doc. 297, #2095, *with* Doc. 305, #2129, *and* Doc. 305-2, #2144). The major change was Christ's conclusion that the landlord that rented a warehouse to the enterprise was not entitled to restitution, as it did not constitute a victim under the MVRA, (*compare* Doc. 297-2, #2108, *with* Doc. 305-1, #2138, *and* Doc. 305-2, #2144)—a conclusion with which the Court agrees, *see infra* Part C. As to the other changes to calculated loss amounts, Christ declares that his subsequent review of the evidence in the government's possession caused him to revise certain amounts to reflect the values that were actually verifiable. (Doc. 305-1, #2136 n.1). As this is the only evidence in the record, the Court accepts Christ's uncontroverted statements and accordingly relies on his superseding spreadsheet as an accurate tabulation of victims' verifiable losses assuming (as the Court finds below, *see infra* Part C) that the methodology he employed comports with the MVRA's diktats regarding which harms are recoverable as restitution.

by a preponderance of the evidence. *Higgins*, 2023 WL 6536752, at \*12 (cleaned up). "Although a district court need not make specific factual findings in calculating restitution, the information underlying an award must have sufficient indicia of reliability to support its probable accuracy." *United States v. Sawyer*, 825 F.3d 287, 294–95 (6th Cir. 2016) (cleaned up). Put another way, restitution (in the nature of equity) is not "a precise mathematical inquiry" but an inexact science that "involves the use of discretion and sound judgment." *Paroline v. United States*, 572 U.S. 434, 459 (2014). Though by statute a restitution award must be set within 90 days of sentencing, 18 U.S.C. § 3664(d)(5), as this Court has already noted in this Opinion and Order, the Supreme Court has explained that a sentencing court may permissibly enter a restitution award beyond that statutory time frame so long as it timely notifies a defendant that it is imposing a restitution obligation and that it simply is holding open the *amount* to be established at a later date. *Dolan*, 560 U.S. at 617–20.

## LAW AND ANALYSIS

Given the nature of the responses filed by Martin, Pestereanu, and Kalonov, the Court believes a short roadmap is in order. Pestereanu challenges the Court's jurisdiction to enter a restitution order at this time—more than 90 days after his sentence and after he has served his term of probation. The Court will address this argument first as a challenge to jurisdiction affects the Court's power over the parties. *Dolan*, 560 U.S. at 610 ("The expiration of a 'jurisdictional' deadline prevents the court from permitting or taking the action to which the statute attached the deadline. The prohibition is absolute."). Finding that it properly has jurisdiction over this

restitution matter, the Court will then turn to all three responding Defendants' arguments that the restitution award should be apportioned among all sentenced Defendants, rather than imposed on all jointly and severally. This step logically follows as the nature of Defendants' liability is a matter tangential to the award amount itself and has been addressed by this Court previously, which means the issue can be resolved without addressing the meat of the government's motion. After concluding (again) that joint and several liability is proper, the Court last turns to whether the government has proved the victims' losses by a preponderance of the evidence and analyzes whether the government's reply adequately addresses the Court's concerns raised at the April 17, 2024, status conference.

### A.    Jurisdiction

Pestereanu's argument (though not developed with reference to any caselaw) boils down to the mistaken beliefs that (1) the 90-day window set forth in 18 U.S.C. § 3664(d)(5) is jurisdictional, and (2) the expiration of his term of probation terminates the Court's authority over him. Both arguments fail.

Start with the former. The Supreme Court explained clearly that the 90-day timeline in § 3664(d)(5) is neither jurisdictional nor mandatory so long as the Court ordered restitution at the time Pestereanu was sentenced. *Dolan*, 560 U.S. at 611. The Court did just that. (Docs. 197, 198; Doc. 246, #1628–29). And Pestereanu cannot suggest he did not have notice of this, as the Court addressed this issue at his sentencing and he did not object to the Court's holding open the *amount* of the award (i.e., the Court's retaining jurisdiction over calculating the proper award amount and

10

entering an order to that effect) until after all others were sentenced. (Doc. 246, #1629). So § 3664(d)(5) does not bar the Court from exercising jurisdiction to enter a final restitution order.

The latter theory—that jurisdiction is wanting because Pestereanu's term of probation has ended—fares no better. Given the Court imposed restitution as *one* part of his sentence under the obligatory terms of the MVRA, that another portion of his sentence (probation) has been fully served and satisfied does not wipe away Pestereanu's obligation to satisfy *all outstanding terms* of the sentence imposed. Such an argument would be the equivalent of permitting a criminal defendant to wait out his sentence without paying any outstanding monetary obligation and then to claim that the outstanding judgment need not be paid because the liberty-restricting portion of his sentence had been completed. Rather, by statute, the "liability to pay restitution shall terminate on the date that is the later of 20 years from the entry of judgment or 20 years after the release from imprisonment of the person ordered to pay restitution." 18 U.S.C. § 3613(b). It is no surprise then that a sentencing court has the statutory authority to enforce outstanding restitution obligations against certain delinquent defendants by subjecting them to (among other things) resentencing, contempt, or the compulsory judicial sale of property. *See id.* §§ 3613A, 3614. Nor is it surprising that the United States may enforce the restitution order to collect all outstanding judgments, *id.* §§ 3612, 3664(m)(1)(A), including by civil mechanisms, such as by establishing a lien on a defendant's property and foreclosing

on such liens, *id.* § 3613; *see also id.* § 3664(m)(1)(B) (granting a victim a lien on the defendant's property).

Simply put, the Court still has jurisdiction to enter and to enforce a restitution obligation against Pestereanu (who was sentenced only three years ago). *Cf. United States v. Bogart*, 576 F.3d 565, 573 (6th Cir. 2009) (affirming a restitution order entered two years after the defendant's sentencing after rejecting an argument that the sentencing court lacked jurisdiction to enter the order).

## B.  Joint and Several Liability

What of the argument raised by Martin, Pestereanu, and Kalonov that the Court should apportion the restitution obligation among Defendants? In their papers, (Doc. 301, #2118–19; Doc. 302, #2121–22; Doc. 303, #2124), none seem to appreciate that the Court previously resolved this issue. In their individual sentences, the Court held each of them jointly and severally liable for the full restitution award. (Doc. 246, #1628; Doc. 260, #1784; Doc. 271, #1895; Doc. 272, #1897; Doc. 294, #2081–82). In other words, the Court already exercised its discretion to determine at their sentencings whether to apportion liability or to hold each party jointly and severally liable for the restitution amount, and the Court concluded that joint and several liability was proper. 18 U.S.C. § 3664(h) ("If … [multiple] defendant[s] [] contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants … ."). So those determinations are part of the final sentence in each of their cases. *Id.* § 3664(o).

12

For that reason, the briefs filed by Martin, Pestereanu, and Kalonov are best construed as motions for the Court to modify the existing restitution orders against each of them. But their requests to alter the liability already imposed do not work. "When a court imposes a sentence, it does not have the authority to change or modify that sentence unless such authority is expressly granted by statute." *United States v. O'Hara*, __ F.4th __, 2024 WL 3873437, at *2 (6th Cir. 2024) (cleaned up). None of the responding Defendants has identified a statutory basis for the Court to modify those prior determinations, which means the Court lacks the authority to modify the liability previously assessed.[4] *Id.* And the Court's independent review of the statutory provisions confirms that no modification of the nature of a defendants' liability for a restitution order exists in any of the cross-referenced provisions. 18 U.S.C. § 3664(o) (allowing modifications to fix clerical errors, to amend the payment schedule, to increase the restitution amount or time for collection based on new information, to resentence the defendant for failure to pay, or to take other remedial action to ensure compliance with an outstanding obligation); *see United States v. Phillips*, 9 F.4th 382, 391 (6th Cir. 2021) (Bush, J., dissenting) (canvassing the grants of authority under these provisions). So the Court may not modify the extant restitution orders holding Defendants jointly and severally liable.[5] Rather, their

---

[4] That contrasts with the sentencing court's express authority under 18 U.S.C. § 3664(d)(5) to "modify" a restitution order after sentencing by entering a new order that defines the *amount* of restitution owed. *See Dolan*, 560 U.S. at 618–21. This provision authorizes the Court's modification of the restitution orders as discussed below. *See infra* Part C.

[5] Besides, Martin, Pestereanu, and Kalonov simply point to information that existed at the time of their sentencings and articulate no new bases for justifying why joint and several liability should not be imposed. (Doc. 301, #2118–19 (referring to the presentence

remedy for having been denied apportionment was to challenge it via an appeal. 18 U.S.C. § 3664(o) (explaining that a restitution order constitutes a final appealable judgment despite the Court's authority under subsection (d)(5) to enter the *amount* of that obligation after sentencing). And because the prior restitution orders imposing joint and several liability stand, the Court denies their requests for apportionment.[6]

## C.   Evidence in Support of Restitution Request

Last but not least, the Court comes to the government's request for restitution and its explanation for how it arrived at its requested amount. No Defendant has objected to the numbers presented. And no Defendant has presented rebuttal evidence undermining the declaration the government proffers. Thus, so long as the government's evidence has the proper indicia of reliability and the amounts requested

---

investigation report); Doc. 302, #2121–22 (same); Doc. 303, #2124 (referring to the presentence investigation report and his plea agreement's statement of facts)). The Court already accounted for such information at the time of sentencing and concluded that joint and several liability was proper due to their factual admissions in their plea agreements that reveal that each had meaningful (even if secondary or otherwise time-limited) involvements in the racketeering enterprise, (Doc. 136, #695–97; Doc. 187, #1101–02; Doc. 228, #1424–25). *United States v. Smith*, 79 F.4th 790, 799 (6th Cir. 2023) (explaining a court may hold defendants liable for the entire loss of the enterprise under conspiracy principles even if the court could ascertain a lesser amount closely related to the actions of the specific defendant). In other words, they have added nothing to the record that would justify deviating from the Court's prior judgment, even assuming the Court had the authority to enter such a modification (which, as explained, it does not, especially considering no party has pointed to statutory authority to do so).

[6] That said, the Court grants Martin's request that her restitution obligation be repaid via nominal periodic payments, (Doc. 301, #2119), given her economic situation, (Doc. 213, #1297), the government's non-opposition to her request, (Doc. 305, #2133), and the Court's statutory authority to modify a defendant's payment schedule and to order repayment via "nominal periodic payments," 18 U.S.C. § 3664(f)(3)(B), (k), (o)(1)(D). And based on her representation that she receives an annual salary of $64,000, (Doc. 301, #2118–19), and that she had non-negligible net positive cash flow when her earnings were lower, (Doc. 213, #1297), the Court concludes that these periodic payments shall take the form of a monthly $200.00 payment.

comply with the statutory provisions defining how a victim's actual losses are calculated, the government will have met its burden to prove the victims' losses by a preponderance of the evidence. *Sawyer*, 825 F.3d at 294–95.

The government's request primarily relies on the declaration executed by Brian Christ, an agent with the United States Department of Transportation's Office of the Inspector General who specializes in investigating criminal activities within the scope of the Department's Federal Motor Carrier Safety Administration. (Doc. 305-1 ¶ 2, #2136). Christ declares that to arrive at each specific requested number he used a specific workflow. He reviewed any victim impact statements provided and analyzed any supporting documentation the victim provided. (*Id.* ¶ 5(a), #2137). He declined to credit any victim's personal assessment of losses by that victim without additional verifying information and focused specifically on those supporting documents that generally carry indicia of reliability (e.g., police reports, inventories, bills, and insurance claims). (*Id.* ¶ 5(b)–(c), #2137). And even if victims did not submit documentation, Christ independently reviewed all evidence gathered during the government's investigation of this matter using those materials to calculate losses. (*Id.* ¶ 5(d), #2138). Christ further declares that he made these assessments based on his personal review of the relevant case materials. (*Id.* ¶ 3, #2136). Given his declaration reflects his personal handling of the loss calculations and his asserted methodology did not blindly accept estimates but demanded verifying documentation, the Court concludes that the government has satisfactorily put forward evidence that holds the requisite sufficient indicia of reliability (especially given no one has put

15

forward arguments or evidence to the contrary). *United States v. Rodgers*, No. 3:17-cr-16, 2020 WL 4495462, at *3 (E.D. Ky. Aug. 4, 2020) (explaining that a victim's statement combined with "[b]ank records, copies of checks, invoices, deposit slips, etc. all demonstrate a presumably reliable record of financial loss[es]"); *United States v. Davis*, Nos. 13-cr-44, 14-cr-23, 2015 WL 2154245, at *3 (E.D. Ky. May 7, 2015) (collecting appellate caselaw that affirms restitution awards supported by only an affidavit, a victim impact statement and spreadsheet with loss calculations, or the presentence investigation report).

What about the costs included in the calculated loss amounts and those that were excluded—do those measures accurately capture the victims' actual losses? As noted above, caselaw relying on equitable principles has held that restitution is to be used in its ordinary sense: the amount necessary to "restor[e] [a victim] to [the] position he occupied before [the] [criminal] event." *Hughey*, 495 U.S. at 416. Simply, the restitution awarded should make the victim whole. *United States v. Bailey*, 973 F.3d 548, 576 (6th Cir. 2020).

The damages Christ included in his victims' loss calculations were (as applicable) (1) the value of household goods that were never delivered or retrieved, (2) payments victims made to the enterprise when they paid additional monies to retrieve the undelivered goods, and (3) any costs the victim paid beyond the amount for which the victim had contracted (charges for unused cubic footage and costs added to the estimates after the goods had been loaded on the truck). (Doc. 305-1 ¶ 5(c)–(d), #2137–38). By contrast, Christ did not include in the calculations losses attributable

16

to (1) damage that occurred to specific goods, (2) the extra costs victims paid to have their items retrieved given their receipt of restitution for the amount they paid the enterprise, and (3) other secondary harms caused by the victims' inability to retrieve their household items (e.g., medical expenses or lost wages) when no verifying documentation had been proffered. (*Id.* ¶ 5(c), #2137–38). Christ also offset the restitution values by the amount of money victims were paid by insurers (instead treating these monies as losses recoverable by the insurers themselves). (Doc. 305, #2130–31; Doc. 305-1 ¶ 5(d), #2138). And finally, Christ declined to credit a landlord's request for restitution, given that entity merely rented a warehouse to the enterprise. (Doc. 305-1 ¶ 5(c), #2138).

After review of the government's updated explanations, the Court concludes that such calculations comport with a proper measure of the losses victims may recover in restitution under the MVRA.

Start with the rejection of the landlord's claim for restitution. Under statute, a victim is one who was "directly and proximately harmed as a result of the commission of an *offense* for which restitution may be ordered including … any person directly harmed by the defendant's *criminal conduct* in the course of the [racketeering] scheme." 18 U.S.C. § 3663(a)(2) (emphases added). The criminal conduct at issue involved the fraudulent misrepresentations of the moving companies to customers about the costs of moving services and the increase of prices after the fact. *See Hughey*, 495 U.S. at 416 (explaining that restitution under the MVRA "is intended to compensate victims *only for losses caused by the conduct underlying the*

17

*offense of conviction*" (emphasis added)). A landlord that rented a warehouse to the enterprise for storage of goods would not have been harmed by the *criminal conduct*. Certainly, the landlord incurred costs when it lost the enterprise as a customer, after the latter shuttered its doors due to the indictment. But those injuries result from the initiation of criminal prosecution and are thus not directly attributable to the *criminal conduct*. So Christ properly declined to afford restitution to this entity.

This principle also justifies Christ's decision to exclude harms related to damaged goods. The proper valuation of a restitution award is based on harms that directly result from the criminal conduct, rather than merely consequential losses with an attenuated connection to the enterprise. *United States v. Bogart*, 490 F. Supp. 2d 885, 894–95 (S.D. Ohio 2007) (explaining that when costs are "a reasonably foreseeable result of the defendant's [criminal] conduct"—such as attorney's fees required to recover a loan executed based on fraudulent misrepresentations—rather than costs incurred indirectly—such as fees to prosecute a civil suit based on the underlying criminal conduct—they are compensable as restitution). While damage to goods while in the enterprise's possession can be traced to Defendants in an indirect sense, such injuries do not directly flow from the *fraud* the enterprise committed to induce its victims to hire their moving companies. Without additional proof on causation, it is not clear that such damage to victims' goods would not have occurred but for the fraudulent inducement to contract with the enterprise. Besides, Defendants are subject to criminal punishment for their *misrepresentations* in engaging in this enterprise, not for wanton destruction of others' property. *United*

*States v. Saad*, 544 F. Supp. 2d 589, 592 (E.D. Mich. 2008) (citing *Ratliff v. United States*, 999 F.2d 1023, 1026 (6th Cir. 1993)). The Court therefore finds that Christ properly excluded these damages to goods as not recoverable as restitution.

On the other side of the ledger, the costs Christ did add to the victims' loss calculations accurately reflect the amount necessary to restore them to the place they occupied before the criminal conduct. Compensating the victims for the goods never delivered or retrieved is both attributable to the enterprise's criminal conduct and would make the victims whole: Defendants were convicted for failing to deliver their clients' goods in part to induce individuals to pay higher prices for delivery. So to the extent that individuals lost their goods to this ransom-esque scheme, awarding restitution for the value of the unreturned goods would remedy the harm wrought by Defendants' criminal conduct. And for similar reasons, the premium Defendants extorted from clients after loading their goods (either by inflating the amount of space used or by charging higher prices than what they had originally agreed) would also properly be included in the restitution awards. Given the criminal conduct involved the fraudulent inflation of costs, such payments are direct harms arising from the enterprise's activities. Victims are entitled to have the extortionate premiums returned, as that would neutralize the taint of the criminal conduct and restore them to their original positions sans the racketeering activities.

Similarly, for victims who paid extra to have their goods retrieved from the enterprise's warehouses, restoring them to the place they were before the criminal conduct would require that they be awarded restitution for the extra costs of paying

two moving companies.[7] Christ and the government both contend the victims should be credited the costs paid to the enterprise, rather than the payments made to the entity that ultimately retrieved the goods. (Doc. 305, #2130; Doc. 305-1 ¶ 5(c), #2137–38). The Court had initially questioned awarding this value to victims because it appeared to be a measure of Defendants' ill-gotten gains, rather than victims' losses, and ill-gotten gains are a proper measure of restitution only if the government establishes a correlation between the two. *Hills*, 27 F.4th at 1202. The government's reply clarified this issue. In its view, the nature of the criminal conduct reveals that the monies paid to Defendants necessarily reflect the loss because they were convicted for fraudulently advertising the repute of their moving companies, which induced victims to contract with them rather than some other business. (Doc. 305, #2130).

This "fraudulent inducement" clarification mollifies the Court's concern. "At common law, a plaintiff could maintain an action for fraudulent inducement where the defendant was 'induced to make a contract of purchase by the fraudulent misrepresentations of his vendor.'" *Barnett v. Kroger Co.*, No., 2024 WL 2078209, at *3 (S.D. Ohio May 8, 2024) (quoting *Wilson v. New U.S. Cattle-Ranch Co.*, 73 F. 994, 997 (8th Cir. 1896)). And were the plaintiff successful, he "could rescind the contract

---

[7] The Court agrees with the government and Christ that the victims are not entitled to both the money paid to the enterprise and the extra money paid to another moving company to retrieve the goods. (*See* Doc. 305-1 ¶ 5(c), #2137–38). The fraud Defendants committed did not induce victims to move but induced them to hire *Defendants* to complete the move they were already contemplating. As a result, that victims paid some money to move their goods was inevitable. But victims are entitled to some return of value to the extent that the costs of their move ballooned as a result of Defendants' criminal conduct—falsely advertising their moving companies as reputable.

or affirm the contract and seek damages," which means "the measure of the damages is the consideration paid." *Id.* (quoting *Wilson*, 73 F. at 997). As the Supreme Court explained over a century ago, "[t]he right not to be led by fraud to change one's situation is anterior to and independent of the contract. The fraud['s] … usual consequence is that … the one who is defrauded has a right, if possible, to be restored to his former position[:] … [to] have his money back." *Nat'l Bank & Loan Co. v. Petrie*, 189 U.S. 423, 425 (1903); *see Smith v. Bolles*, 132 U.S. 125, 129–30 (1889) (holding that the proper measure of damages for a claim for fraudulent inducement "was not the difference between the contract price and the reasonable market value if the property had been as represented to be," but "[w]hat the plaintiff paid" for the property). As applied to Defendants' scheme (whose misrepresentations induced victims to contract with them), the proper remedy as recognized at common law is to restore the victims to their prior positions by returning the amount paid to Defendants. *Cf. United States v. Deller*, Nos. 1:19-cr-116, 1:23-cv-485, 2024 WL 3540390, at *5 (S.D. Ohio July 25, 2024) (concluding that rescinding a plea agreement and permitting a defendant to withdraw his plea was the remedy that "return[ed] both parties to the positions they occupied before th[e] error [precipitated by ineffective assistance of counsel] occurred" given the mistake figured into the defendant's calculus for entering into the plea agreement). Simply, this fraudulent inducement theory adequately justifies awarding victims, who had to hire another source to have the goods delivered, the value of the monies they paid to Defendants— the equivalent of rescinding the contract induced fraudulently.

That leaves the viability of Christ's two additional computations in arriving at his calculation of victims' losses: the exclusion of secondary harms and the offset for any insurance monies paid out (both of which had partially motivated the Court to hold the April 17, 2024, telephone status conference).

As to the former, the government's reply appears to concede that secondary harms costs are recoverable as restitution. (Doc. 305-2, #2141 (including in one victim's total "items purchased while [he] waited for the delivery of [his] [household goods]")). After all, foreseeable second order costs occasioned by the failure to deliver goods would need to be returned to the victim to put him back to the place he occupied absent the criminal conduct. (*See* Doc. 305, #2130). But the government nonetheless maintains that not all victims can recover those costs. That is because many who suffered such losses never submitted supporting documentation, which means the values "could not be verified." (*Id.*; *see, e.g.*, Doc. 305-2, # 2141 (noting that the victim had "[i]nsufficient document[ation] to support payment for furniture while the[] [victim] waited for delivery")). Because the Court must formulate a restitution award using evidence that has sufficient indicia of reliability, *Sawyer*, 825 F.3d at 294–95, it finds that the government is correct to argue that the secondary losses requested by certain victims cannot form a part of the losses recoverable as restitution in this matter.[8]

---

[8] To be clear, the Court reaches this conclusion only because the government represents that some victims did not provide evidence to support their request for such losses. As a result, by declining to award such costs to certain victims here, the Court should not be understood to be holding that secondary losses that directly flow from the criminal conduct are not recoverable as restitution under the MVRA—these direct secondary harms comfortably count

As for the latter (the adjustment for insurance already paid), the government justifies this offset by reference to 18 U.S.C. § 3664(j)(1). (Doc. 305, #2131). Subsection (j)(1) directs that whenever "a victim has received compensation from insurance or any other source with respect to a loss, the [C]ourt shall order that restitution be paid to the person who provided or is obligated to provide the compensation." In other words, the language in 18 U.S.C. § 3664(f)(1)(B) that previously gave the Court pause is best understood as preventing a loss calculation from being reduced because a victim is insured against the loss caused by a defendant's criminal conduct. But subsection (f)(1)(B) does not answer *who* receives the award amount. That is resolved by subsection (j)(1), which directs the Court to compensate the party who assumed the victim's loss directly. Namely, "§ 3664(j)(1) [] shifts *payment* of [a victim's] restitution amount … to th[e] [reimbursing] party." *United States v. Thompson*, 792 F.3d 273, 279 (2d Cir. 2015). For this reason, the Court concludes that the government properly reduced the award for victims who already received compensation from insurers and correctly submitted the insurers' claims with its restitution request. And the Court agrees with the government that the insurers (and Salvation Army, which assumed some of the victims' losses by assisting in recovery of goods the enterprise never delivered, *Thompson*, 792 F.3d at 278) are to be paid *after* the individual victims, (Doc. 297, #2098), in line with the

---

towards "the full amount of [a] victim's loss[]." 18 U.S.C. § 3664(f)(1)(A). Should victims come forward with additional evidence supporting these secondary harms, they may petition the Court for an order adding those costs to the restitution amount as laid out in the MVRA—though the Court acknowledges that such a request will likely face an uphill battle, as the requesting party must show "good cause for the failure to include such losses in the initial claim for restitutionary relief." *Id.* § 3664(d)(5).

MVRA's statutorily mandated order of priority. 18 U.S.C. § 3664(j)(1) ("[T]he restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to [] a provider of compensation.").

Altogether, the Court concludes that the government, particularly via its reply,[9] has both adequately supported its restitution requests for the 87 victims of this enterprise with sufficient reliable evidence and adequately explained why its calculations of those victims' losses are legally correct under the MVRA and corresponding caselaw. The Court will therefore grant the government's motion and order Defendants to pay the victims restitution in the amounts tabulated by Christ and laid out in the separately docketed Appendix to this Opinion and Order.[10]

## CONCLUSION

At long last, this criminal racketeering matter comes to rest. After review of the government's submissions and analysis of the belated responses from three Defendants, the Court reaches the sole issue (over which it still retains jurisdiction) that was left open at each party's sentencing: the *amount* of restitution Defendants owe victims under the MVRA. As previewed in its prior orders on restitution, (Docs. 168, 246), the Court now modifies Defendants' respective judgments under 18 U.S.C.

---

[9] The Court briefly notes that it appreciates the government's decision to address the concerns the Court raised in the April 17, 2024, status conference and to revise its calculations of the restitution awards accordingly.

[10] The Court will file separately a publicly available Appendix setting forth the names of the victims and the amount of restitution owed. But in the interests of protecting the privacy of these parties, the Court will file a second, sealed Appendix that details the contact information for these victims, so that the Clerk of the United States District Court for the Southern District of Ohio may distribute restitution funds.

§ 3664(d)(5) to state the award amount—though it adheres to its prior determination that Defendants will be held jointly and severally liable for this award.

Simply, as explained in detail above, the Court **GRANTS IN PART AND DENIES IN PART**[11] the Government's Motion for Restitution Order (Doc. 297) and **MODIFIES** the prior judgments in this matter as to restitution as follows:

The Court **ORDERS** Defendants Andrey Shuklin, Serghei Verlan, Phyllis Ricci Quincoces, Vladimir Pestereanu, Ievgen Kariaka, Akhliddin Kalonov, Roman Iakovlev, Jessica Martin, and Seth Nezat **TO PAY A TOTAL OF $735,185.75 IN RESTITUTION** to the victims of their criminal conduct according to the schedule set forth in the separately docketed Appendix to this Opinion and Order, for which total amount they are **JOINTLY AND SEVERALLY LIABLE**. In accordance with 18 U.S.C. § 3664(j)(1), the Court **ORDERS** that individual victims identified in the separately docketed Appendix as the **PRIMARY PAYEES** be paid before any restitution funds are paid to Salvation Army or to the listed insurers, who are identified in the separately docketed Appendix as the **SECONDARY PAYEES**.

In line with this order, the Court rejects the requests for apportionment made by Martin, Pestereanu, and Kalonov, which the Court construes as motions for the Court to modify the previously entered restitution orders. But it sustains Martin's additional request that she be permitted to repay her restitution obligation via periodic nominal payments. Accordingly, the Court **DENIES** Kalonov's Motion for

---

[11] Because Christ revised his calculations, the Court **DENIES** the Motion (Doc. 297) **IN PART** to the extent that it requested a restitution amount that differs from the revised spreadsheet attached to the government's reply.

Apportionment (Doc. 303), and Pestereanu's Objection to Restitution and Request for Apportionment Should Restitution Be Ordered (Doc. 302). And it **GRANTS IN PART** (to the extent that Martin requests a modification to her repayment plan under 18 U.S.C. § 3664(f)(3)(B), (k), (o)(1)(D)) and **DENIES IN PART** (to the extent that Martin seeks apportionment) Martin's Motion with Respect to Restitution (Doc. 301). So pursuant to 18 U.S.C. § 3664(f)(3)(B), the Court **ORDERS** that Martin **SHALL** satisfy her restitution obligations by making **NOMINAL PERIODIC PAYMENTS IN THE FORM OF A MONTHLY $200.00 PAYMENT**.

 **SO ORDERED.**

September 5, 2024
**DATE**

          **DOUGLAS R. COLE**
          **UNITED STATES DISTRICT JUDGE**